TSCHANTZ, Appellant,

v.

FERGUSON, Appellee.

[Cite as *Tschantz v. Ferguson* (1994), 97 Ohio App.3d 693.]

Court of Appeals of Ohio, Cuyahoga County.

No. 64115.

Decided Sept. 7, 1994.

694

*John E. Duda*, for appellant.

*Henry A. Hentemann*, for appellee.

---

HARPER, Presiding Judge.

The present action commenced in June 1987 when plaintiff-appellant, Elizabeth Tschantz, filed a complaint against defendant-appellee, State Auditor Thomas E. Ferguson, in the Court of Common Pleas of Cuyahoga County. After the Supreme Court of Ohio resolved a jurisdictional conflict, *Tschantz v. Ferguson* (1991), 57 Ohio St.3d 131, 566 N.E.2d 655, trial was set to commence on July 20, 1992 in the court of common pleas. On this date, the court granted summary judgment in favor of Ferguson on Tschantz's intentional/negligent infliction of emotional distress claim, a claim involving the mental suffering which Tschantz purportedly experienced, and still does, as a result of employment with the Office of the Auditor of State ("State Auditor's Office"). Tschantz, in addition to challenging this ruling on appeal, takes issue with the trial court's rulings on several pretrial motions.

As gleaned from all of the Civ.R. 56(C) evidence before us, Tschantz arrived in the United States in 1960 after enduring the Hungarian Revolution and sexual abuse at the hands of her foster father and European sponsor. She was brought here by an American family, attended private boarding school in Massachusetts, and obtained a diploma from then-existing Canton Business College.

In 1964, Tschantz married Richard Teolis. The marriage produced two children, but ended in divorce in 1971. Tschantz asserted that Teolis sexually and physically abused her both during and after their marriage.

Tschantz was hired as a State Examiner I in the State Auditor's Office on February 14, 1977 with the help of a friend, Thomas Gilmartin, Jr., and his father, a state representative. Although her superiors recommended that she be discharged for incompetence in an evaluation dated October 14, 1977, Tschantz was promoted to State Examiner II on February 26, 1978.

Subsequently, the Personnel Director of the State Auditor's Office, Ron Beight, contacted Tschantz and requested without explanation that she meet him at a restaurant in New Philadelphia. Tschantz met with Beight, at which time she learned from him that he was responsible for the retention of her position with the State Auditor's Office. Beight sought sex in return for his assistance. Tschantz, intimidated by Beight, allowed him to take her to a motel across the street, where the two engaged in sex. Thereafter, a sexual relationship continued, albeit the meetings were infrequent.

Tschantz held a barbecue at her house in September 1978 for the "Friends of Ferguson" campaign fund, as advised by Gilmartin. She met Ferguson for the first time at this function.

In May 1979, Tschantz married Robert Tschantz. This marriage ended in divorce in 1982.

Meanwhile, Tschantz received promotions without actively seeking them. She was promoted to State Examiner III on November 18, 1979, to State Examiner IV in September 1980, to State Examiner V on April 5, 1981, and to State Examiner Supervisor, *i.e.*, Examiner VI, on October 8, 1981. Tschantz was still participating in a sexual relationship with Beight throughout these years.

Ferguson's chauffeur, William Schumann, contacted Tschantz on May 24, 1982 while she was an examiner in New Philadelphia. Schumann directed her to come to a motel located on Brookpark Road in Cleveland, for the purpose of meeting with "the boss" and to pick up campaign literature and other materials. After dinner with Ferguson, Tschantz was to stay overnight at the motel.

Schumann, Ferguson, and Tschantz dined in the lounge of the motel. On the way to their rooms, Schumann continued to the lobby desk. Tschantz reached her door first. Ferguson took the room key from her, opened the door and allowed her to enter the room. She immediately turned around and observed that Ferguson followed her into the room and stood directly behind her. Ferguson gave her a "bear hug," and then stated, "I guess I shouldn't be here, I'm your boss." Ferguson persisted in his sexual advances and these advances led to intercourse with Tschantz.

The following day, Beight communicated to Tschantz that she was not to make a written record of her previous day's whereabouts. Moreover, he indicated that he knew she spent the evening with Ferguson.

Tschantz was appointed as a Regional Administrator on January 22, 1984. She was fully surprised by this appointment, which placed her in charge of all auditor operations in twenty counties. As part of her duties, Ferguson informed Tschantz that she was required to enforce his two-percent Flower Fund contributions from state employees. She was moreover charged with campaign fundraising responsibilities. According to Tschantz, she was aware of her lack of qualifications for this position; she accepted it, however, out of financial necessity.

Tschantz sought to comply with her obligations regarding the raising of campaign funds for Ferguson. In addition to the two-percent efforts, she aided in the organization of three golf outings and two barbecues in 1984. Tschantz maintained that these organizational activities occurred on state time; a vast

amount of her state time was thus devoted to fundraising efforts as ordered by Ferguson.

Tschantz sought medical treatment from Dr. Montgomery in 1984 for fatigue, loss of appetite, and her depressed mood. The doctor recommended that she quit her position with the State Auditor's Office. He then referred her to a psychologist, Dr. Robert Devies.

Dr. Devies met with Tschantz on December 20, 1984. He conducted psychological tests and then commenced treatment. Dr. Devies repeated Dr. Montgomery's suggestion that she leave the State Auditor's Office. Tschantz chose not to follow this advice because of financial obligations.

Consequently in 1985, Tschantz organized and participated in four other fundraisers, including a major event held at the Landerhaven Golf Course on June 6. She arranged to meet with her co-organizers, Tony Sabatino and Angelo Guarino, at the conclusion of the event. The meeting, however, never occurred because Schumann instructed Tschantz to be at the Holiday Inn in Beachwood to meet Ferguson. Schumann added that she was "to do what the boss says." The final sexual episode between Ferguson and Tschantz occurred on this date, June 6, 1985. Tschantz estimated that she engaged in sex with Ferguson fifty times in the three years of their involvement.

Either during the late summer or early fall of 1985, Tschantz gathered up enough strength to end her relationship with Ferguson. Ferguson later responded, according to Tschantz, by suggesting that she take a leave of absence. She refused to comply with this suggestion. Tschantz was later investigated from July 10, 1986 through August 6, 1986 pertaining to her alleged misuse of a state motor vehicle. Tschantz maintained that Ferguson attempted to persuade her to quit her position with the State Auditor's Office. She finally capitulated on August 22, 1986, when she was placed on disability leave. Tschantz has not worked since August 22, 1986, and has received continuing psychological treatment.

Tschantz admitted that she never resisted Ferguson's commands to meet him during the three years of their involvement, except for one time when her responsibilities as a regional administrator precluded a meeting. She further admitted that she never verbalized her desire not to engage in sexual intercourse. Additionally, Tschantz acknowledged that Ferguson never orally made offers or promises of promotions or raises in exchange for the sex. Rather, she consistently maintained that she would not dare reject Ferguson's suggestions: she was afraid to voice any objections, she felt she had no choice but to reciprocate, and Ferguson did not have to threaten her verbally for her to know that rejecting Ferguson would harm her career in the State Auditor's Office.

Based upon this presentation of allegations and facts, and additional facts as will be disclosed *infra*, the trial court granted Ferguson's motion for summary judgment on July 20, 1992.[1] The court issued an opinion and judgment entry containing the following relevant findings and conclusions of law.

The court initially specified that Tschantz's claim was not for sexual harassment, but for intentional or, in the alternative, negligent, infliction of emotional distress. Next, the court outlined Tschantz's claim, to wit: Tschantz suffered severe emotional distress as a result of an involuntary sexual relationship with Ferguson, which was exacerbated by her forced participation in improper fundraising activities.

The court first concluded that Tschantz failed to state a claim for which relief could be granted with regard to negligent infliction of emotional distress. This conclusion was based upon *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 6 OBR 114, 451 N.E.2d 759; *Dowell v. Cleveland Clinic Found.* (Apr. 9, 1992), Cuyahoga App. No. 59963, unreported, 1992 WL 74225; and *Brown Deer Restaurant, Inc. v. New Market Corp.* (Mar. 28, 1985), Cuyahoga App. No. 48910, unreported, 1985 WL 9802.

Second, the court ruled that Tschantz failed to meet the evidentiary burden required by *Pyle v. Pyle* (1983), 11 Ohio App.3d 31, 11 OBR 63, 463 N.E.2d 98, to satisfy the essential elements of a claim for intentional infliction of emotional distress. The trial court found that Tschantz failed to offer any evidence that Ferguson intended, knew, or should have known that his actions would result in serious emotional distress to her. The court also found that Tschantz consented to both the sexual relationship and accepted her fundraising duties as a condition of her employment. Therefore, the court concluded that Tschantz failed to satisfy the first element of her prima facie case. The court additionally found Tschantz failed to satisfy the second element of her prima facie case because Ferguson's alleged conduct did not amount to extreme and outrageous conduct. This analysis prompted the court to find there was no genuine issue of material fact for litigation, and Ferguson was entitled to judgment as a matter of law.

Tschantz now appeals and claims as error:

"Assignment of Error No. 1

"The court erred in granting summary judgment on plaintiff-appellant's claim for intentional or reckless infliction of emotional distress.

---

1. Tschantz named the state of Ohio as a defendant in this action based upon R.C. 4121.80. The trial court dismissed the state as a defendant pursuant to its motion on November 23, 1987, ruling that the complaint was not filed within the pertinent statute of limitations. Tschantz did not appeal from this ruling.

"Assignment of Error No. 2

"The court erred in granting summary judgment on plaintiff-appellant's negligent infliction of emotional distress claim.

"Assignment of Error No. 3

"The court erred in granting defendant-appellee's protective order regarding his net worth.

"Assignment of Error No. 4

"The court erred in overruling plaintiff-appellant's sixth motion to compel discovery having to do with defendant-appellee's net worth.

"Assignment of Error No. 5

"The court erred in overruling plaintiff's fifth motion to compel discovery regarding other similar acts."

In her first assignment of error, Tschantz relies heavily on the malleability of the Restatement of the Law 2d, Torts (1965), specifically Topic 5, Section 46 and its accompanying comments. She also premises her arguments on sister state and federal cases to illustrate how the Restatement should be interpreted to encompass her allegations and to necessitate a reversal of the trial court's ruling on Ferguson's motion for summary judgment. Basically, Tschantz argues that evidence of Ferguson's abuse of his position of authority, his knowledge of her being "easy prey," and his inducing her into committing illegal and unethical campaign tactics required that the trial court deny Ferguson's motion for summary judgment, as this evidence creates genuine issues of material fact for litigation.

The granting of summary judgment is only appropriate if there is no genuine issue as to any material fact, and reasonable minds can come to but one conclusion, which is adverse to the nonmoving party. *Toledo's Great E. Shoppers City, Inc. v. Abde's Black Angus Steak House No. III, Inc.* (1986), 24 Ohio St.3d 198, 201, 24 OBR 426, 428–429, 494 N.E.2d 1101, 1103–1104; Civ.R. 56(C). An order granting summary judgment will, therefore, be upheld only where the record discloses no genuine issue of material fact and the moving party is entitled to judgment as a matter of law when construing the evidence most strongly in favor of the nonmoving party. *Johnson v. New London* (1988), 36 Ohio St.3d 60, 521 N.E.2d 793; *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274. Summary judgment is a procedural device that is used to terminate litigation and, therefore, must be awarded with caution with all doubts resolved in favor of the nonmoving party. *Osborne v. Lyles* (1992), 63 Ohio St.3d 326, 333, 587 N.E.2d 825, 831; see, also, *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 359, 604 N.E.2d 138, 140.

With regard to procedure:

"Upon a motion for summary judgment pursuant to Civ.R. 56, the burden of establishing that the material facts are not in dispute and that no genuine issue of fact exists is on the party moving for the summary judgment. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46." *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 117, 522 N.E.2d 489, 504–505.

However, "[a] motion for summary judgment forces the nonmoving party to produce evidence on any issue for which that party bears the burden of production at trial. *Celotex v. Catrett* (1986), 477 U.S. 317, 322–323 [106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265, 273–274]. See, also, *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 113, 526 N.E.2d 798, 800–801." *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 111, 570 N.E.2d 1095, 1099.

The trial court correctly identified that this case is not a case of sexual harassment. In her complaint, Tschantz set forth the following allegations:

"5. Defendant Ferguson inflicted emotional distress upon Plaintiff in that he intimidated her, importuned her and imposed upon her to engage in an intimate sexual relationship with Defendant Ferguson * * *.

"6. Defendant Ferguson further inflicted emotional distress upon Plaintiff by personally and through employees intimidating and coercing Plaintiff to engage in unethical and improper fundraising activities on his behalf by compelling her to collect from state employees, subcontractors and others cash contributions to his political funds under duress.

"7. Plaintiff further says that Defendant Ferguson has by this conduct done great harm to her; has caused her to have serious and disabling mental anguish and has damaged Plaintiff.

"8. Defendant Ferguson's conduct as aforesaid caused a complete and disabling nervous breakdown commencing on or about August 22, 1986 after which time Plaintiff has been unable to work and has been disabled.

" * * *

"11. Alternatively, Plaintiff claims that Defendant Ferguson should have realized that his conduct involved an unreasonable risk of causing Plaintiff severe emotional distress."

Clearly, this language does not present a claim for relief under Title VII of the Civil Rights Act of 1964, Section 2000e *et seq.*, Title 42, U.S.Code ("Title VII"). See *Meritor Sav. Bank, FSB v. Vinson* (1986), 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49.

In addition, even though the Supreme Court of Ohio recognized the existence of a common-law action for sexual harassment in *Kerans v. Porter Paint Co.* (1991), 61 Ohio St.3d 486, 575 N.E.2d 428, Justice Holmes, in a dissent, correctly recognized that the *Kerans* majority did not explicitly define "sexual harassment" or supply the necessary elements required to be proven by a plaintiff to establish the tort's existence. See *Barney v. Chi Chi's, Inc.* (1992), 84 Ohio App.3d 40, 616 N.E.2d 269 (trial court, citing Justice Holmes' dissent, reviewed a common-law sexual harassment claim based upon federal law, since the court in *Kerans* "did not articulate the elements for this newly recognized tort"; appellate court did not review the sexual harassment claim because appellant did not challenge the trial court's summary of the substantive law).

Justice Holmes further acknowledged that state tort law provides remedies for victims of sexual harassment, including actions based upon assault and battery theories. *Kerans,* 61 Ohio St.3d at 498, 575 N.E.2d at 437. As a caveat, however, tort claims "each have their own distinct elements, which may not be blurred by lumping them into a general claim for sexual harassment." *Id.* Consequently, if a plaintiff chooses to seek redress through a tort action, *e.g.,* an intentional infliction of emotional distress claim, the party is required to prove all of the essential elements of that tort. Tschantz, therefore, pursuant to Civ.R. 56(C), was still required to refute Ferguson's argument that there were no genuine issues of material fact as to whether he intentionally inflicted emotional distress upon her and not as to whether he sexually harassed her.

Accordingly, in reaching our decision in this assignment of error, we need focus our inquiry only upon the elements of the tort of intentional infliction of emotional distress as enunciated in *Pyle.* Namely, we address the intentional nature of Ferguson's alleged culpable conduct and whether the conduct was extreme and outrageous, beyond all bounds of decency and considered intolerable in a civilized community.

■ There are four elements which must be proved in order for a plaintiff to recover in an action for intentional infliction of emotional distress. These elements are:

" * * * 1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go 'beyond all possible bounds of decency' and was such that it can be considered as 'utterly intolerable in a civilized community,' Restatement of Torts 2d (1965) 73, Section 46, comment d; 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that 'no reasonable man could be expected to endure it,' Restatement of Torts 2d 77, Section 46, comment j. * * *" *Pyle,* 11 Ohio App.3d

at 34, 11 OBR at 66–67, 463 N.E.2d at 103.  See, also, *Ashcroft v. Mt. Sinai Med. Ctr.* (1990), 68 Ohio App.3d 359, 588 N.E.2d 280.

The Supreme Court of Ohio in *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 375, 6 OBR 421, 426–427, 453 N.E.2d 666, 671–672, stated with regard to the conduct which is necessary to make out a claim for the intentional infliction of emotional distress:

" ' * * * Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" ' "

In the present case, Ferguson, in his motion for summary judgment, claimed that his relationship with Tschantz was an "affair" between "consenting adults." He supports this claim with the evidence that Tschantz neither rebuffed his advances nor complained to anyone about their relationship.  Tschantz admitted that Ferguson never verbally threatened her with termination or any other threat.  As further support, Ferguson stresses that Tschantz was not fired from her position as Regional Administrator after she ended their affair; rather, Tschantz left the State Auditor's Office of her own accord on mental disability.

Tschantz attached an affidavit to her response to Ferguson's motion for summary judgment.  Therein, she averred:

"14.  This was entirely a sexual relationship to satisfy Mr. Ferguson's sexual needs and for his sexual pleasure.

"15.  It was loveless.  I did not love him.  He never indicated he loved me.  I was his sexual slave.  It was sex on his demand.  It was neither a romance nor an affair, I was afraid of him, and did not 'consent' to the relationship in the usual meanin [*sic* ] of the word.  He had power over me as my employer and person who could have hurt me financially.

"16.  I was told by Schumann [Ferguson's chauffeur], 'You do as the boss says'.

"17.  I ended the sex when I got the personal courage to say 'no more'."

Tschantz elaborated on her relationship with Ferguson and how she viewed his inherent power as her employer during her deposition.  She testified as follows:

"Q.  What did Mr. Ferguson do to you personally that made you so that you felt he was going to harm you?

"A.  He gave me a paycheck.

"Q. I give paychecks to my employees here. Does that mean that they have to be fearful of me?

"A. I don't know. I don't know what kind of a person you are, Mr. Hentemann. Are you an abusive person? Are you a harasser? Do you take your employees to bed?

"Q. Let me ask you this question?

"A. Then they don't have to be afraid of you?

"Q. Is there anything else that made you fearful of Mr. Ferguson other than the fact that he was your employer?

"A. I know what Mr. Ferguson's powers are and I certainly knew by then what Mr. Ferguson's powers were in 1982.

" * * *

"Q. Were you afraid of him, is that your statement?

"A. Fear would probably be the word that I have to use. I was at certain times terrified.

"Q. Why?

"A. Because I know how Mr. Ferguson operates his office.

" * * *

"A. Mr. Hentemann, I am going to say this to you until you get very very tired of me. I was afraid of Mr. Ferguson, and I was afraid to say no to him. And if you keep asking me I will always give you the same answer. I was terrified of that man. I was terrified how that man handled himself. * * *

" * * *

"A. If I remember correctly, Mr. Hentemann, I told you Mr. Ferguson does not have to threaten anyone. He has got nine hundred people to do it for him.

"Q. Did he threaten to fire you?

"A. Personally, no. To feel the threat, yes.

" * * *

"Q. Did Mr. Beight ever promise you any position with the Auditor's Office because you were having sex with him?

"A. Mr. Beight reassured me that the only reason I am there is because of him.

" * * *

"A. Otherwise, my such and such would have been out the door.

" * * *

"Q. Okay. But Mr. Ferguson didn't save your job. It was Mr. Beight and Mr. Gillmartin [*sic*]?

"A. That's what Mr. Beight said.

" * * *

"Q. What did Mr. Ferguson—

"A. I recommended you. I recommended you. Mr. Ferguson said who do you think makes the ultimate decision in approving—[.]"

Tschantz additionally attached the affidavit of Dr. Alvin R. Sutker, a clinical psychologist, to her reply brief. Dr. Sutker provided that Tschantz first sought treatment from him on April 9, 1987, and at the time he penned the affidavit, Tschantz had visited with him approximately four hundred and fifty times. Dr. Sutker's diagnosis of Tschantz is that she is a neurotic depressive with bouts of major depression. He continued:

"11. During my treatment of Mrs. Tschantz she gave me her history before her relationship with Thomas E. Ferguson as well as a history of being importuned by Mr. Ferguson to engage in a loveless sexual relationship with him, his promoting her to a job she could not perform, and his requiring her to devote time to questionable fund raising activities.

"12. In my opinion Mrs. Tschantz is a truthful reporter.

"13. It is my opinion that there is a direct relationship of cause and effect between Thomas Ferguson's conduct in relationship to Mrs. Tschantz and the depression for which I have been and continue to treat her. This condition is an aggravation, accerbation [*sic*] and worsening of her pre-existing depression, which required treatment and has been disabling.

"14. This emotional distress resulting from the conduct of Mr. Ferguson has been severe and disabling to the point that Mrs. Tschantz is totally disabled from productive work at this time.

"15. Mrs. Tschantz will continue to be totally disabled for an indefinite period of time in the future and is probably permanently disabled and she will require continued treatment by way of office pscyhotherapy [*sic*] and drug therapy, a significant part of which is a result of Mr. Ferguson's conduct.

"16. All of my opinions expressed herein are held by me with a reasonable degree of psychological certainty."

Dr. Sutker was also deposed by Ferguson's counsel. Relevant testimony follows:

"Q. Is it fair to state that at the time that she started in the auditor's office she was suffering from a state of depression?

" * * *

"A. All I'm saying is that she was able to work and she was able to maintain herself, she was able to drive. She was able to shop. She was able to deal with her kids. She was concerned about their welfare, so depression, I think, if you want to call it that, was at a low end at the time she started because she was functional, she was able to accomplish things. I think that was important to me.

" * * *

" * * * I must add, her needs to survive had been so accentuated throughout the years, her needs to maintain herself, her ego strength, that she would put up with, she would try to handle sexual impositions and maintain her working capability. So that if Mr. Beight threatened her job situation, I can see where that might be a factor in her continuing.

"Q. Could it also just as equally be a factor that she was using Mr. Beight to get ahead in her job if he controlled her job.

"A. I doubt it.

"Q. There's a doubt, but that's just as plausible?

"A. Because—no, it's not just as plausible, sir, because she has a sense of integrity that doesn't permit her to use people. She's been used all her life. And she is opposed to using people as such.

"Q. But she has also learned, is it not true, doctor, that at a young age, through sexual favors, she can get ahead, she can get to the United States, maybe she can get a job, maybe she can get ahead in her job through giving sexual favors to people. She learned that at a young age, did she not?

"A. I think the lesson that she learned was that when sexual favors are demanded—well, I would say even when someone in authority demands something, whether it's sexual or whatever, that she would have to comply in order to survive.

" * * *

"Q. And at that point in time, is it your opinion that that relationship with Mr. Ferguson caused her depression or just aggravated the depression?

"A. Well, I think it exacerbated her depression and aggravated her depression.

"Q. What do you mean by exacerbated?

"A. Well, strongly aggravated and because—

"Q. In other words, just so I understand, is that the depressive state was there [*sic*]?

"A. To a certain degree, yes. Now, I think it's significant that it was shortly after her ending the relationship with Mr. Ferguson that she felt so depressed that she had to leave her job and go on some partial disability.

" * * * *

"Q. How do you determine the aggravation of her depressive state by the relationship with Mr. Ferguson? How did you arrive at that, that there was an aggravation?

"A. Well, I think that she resented being imposed upon. She felt she just had to comply with the boss. And she was told that, I believe by Mr. Beight and others, that doing her job implied doing what she was told to do."

Concerning Tschantz's inability to end her relationship with Ferguson until over three years after its inception, Dr. Sutker opined that Tschantz was unable "to sufficiently gather herself to say no. She couldn't do that psychologically * * *."

Tschantz further provided evidence of medical and hospital bills. These bills disclose that she was hospitalized at Windsor Hospital in Chagrin Falls, Ohio, from January 19, 1989 to January 31, 1989. According to Dr. Sutker, the hospitalization was necessitated by her depressive state and was monitored by F.A. Lingl, M.D. As evidenced by her statement of account, Dr. Lingl consulted with Tschantz eighty-seven times from April 15, 1987 to October 25, 1991, and visited her five times during her hospitalization. The evidence further confirmed that Tschantz sought and received treatment from Dr. Sutker on over four hundred occasions for the period of April 9, 1987 to December 3, 1992.

Ferguson responded to all of this evidence by boldly asserting, "[t]he key to this entire case lies in one *undisputed* fact: when the Plaintiff ended her affair with the Defendant, nothing happened! There was no retribution and recrimination. Mrs. Tschantz wasn't fired. She wasn't demoted." (Emphasis *sic*.) Assuming *arguendo* Tschantz's allegation that she feared reprisal by Ferguson if she rejected him was true, and, in fact, Ferguson impliedly threatened her with retaliation if she rejected him, simply because retaliation did not occur does not definitively connote the threat of reprisal did not exist during the three years of their relationship.

Tschantz reacted to Ferguson's "no retribution" stance with a supplemental affidavit. Therein, Tschantz averred that Ferguson ordered that she be followed for an eighteen-day period commencing July 1986. She further averred that she was aware of the surveillance. She explained her belief that this investigation was an attempt to intimidate her into quitting her position. As a result,

Ferguson would avoid any implication of retaliation on his behalf. Plaintiff's Exhibit 14 is a detailed, minute-by-minute account of Tschantz's comings and going from July 10, 1986 to August 6, 1986. Plaintiff's Exhibit 14 also included a cover letter from Charles Hannigan, Special Investigations, to Ferguson directly, advising Ferguson of Tschantz's behavior and the accompanying account of her activity. Only fourteen days after the investigation was arrested, Tschantz went on disability leave.

Ferguson, in turn, supplied the court with supplementary materials, including his own affidavit and those of McCullough Williams and John D. Rathburn, employees of the State Auditor's Office. Essentially, the affidavits provide that the investigation was precipitated by a verbal complaint from an employee in the North Canton State Auditor's Office. The complaint focused on Tschantz's misuse of her state vehicle and her inability to maintain a normal workday schedule.

After reviewing all of the parties' documentary evidence, it is apparent to this court that the trial court seemingly ignored Tschantz's evidence in arriving at certain conclusions. Particularly disturbing to us is the court's characterization of Tschantz's relationship with Ferguson as a consensual one when substantial evidence offered by Tschantz, including psychological testimony, casts doubt on such a conclusion. We, therefore, stress that the trial court's analysis of the motion for summary judgment included conclusions which were reached in violation of the Civ.R. 56(C) mandate that *all* evidence be construed in favor of Tschantz, the nonmoving party. Our view is bolstered by the fact that "consent" is an affirmative defense that is a question of fact. See *Bunce v. Parkside Lodge of Columbus* (1991), 73 Ohio App.3d 253, 259, 596 N.E.2d 1106, 1110 (trial court improperly found admission of consent determinative of sexual assault claim, since it is a question of fact for the jury whether consent to sexual intercourse is valid). Moreover, even though Tschantz does not submit a sexual harassment claim, we recognize that "consent" is not a defense even in sexual harassment litigation. See *Meritor*, 477 U.S. at 68, 106 S.Ct. at 2406, 91 L.Ed.2d at 60 (in Title VII cases of sexual harassment, "the fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit").

A superior's involving an employee in a sexual relationship is morally distasteful. A superior's implied threat that if the employee did not participate in the sexual relationship termination or lack of promotion would follow is repugnant. Under these factual circumstances, the Supreme Court of Ohio has recognized that the employee may be entitled to redress based upon a common-law action for sexual harassment. See *Kerans*, 61 Ohio St.3d at 491, 575 N.E.2d at 432 ("If [defendant's employee] did have this authority [of supervision], and if he used this

authority to cause Kerans to feel that she had to endure his advances in order to keep her job, then a jury could reasonably find that he acted within the scope of his employment.").

The employee may also possess a right to remedy under Title VII when confronted with such implied threats of reprisal. See *Meritor; Western–Southern Life Ins. Co. v. Fridley* (1990), 69 Ohio App.3d 190, 590 N.E.2d 325, jurisdictional motion overruled (1991), 57 Ohio St.3d 709, 566 N.E.2d 681. However, Tschantz did not plead either of these claims for relief, relying on intentional or, in the alternative, negligent infliction of emotional distress.

In *Stockett v. Tolin* (S.D.Fla.1992), 791 F.Supp. 1536, a case heavily relied upon by Tschantz, the employee brought a Title VII action against her employer as well as presenting several state tort claims, including one for intentional infliction of emotional distress. The defendant employer made blatant physical contact with, and verbal comments and sexual advances to, the employee on a nearly daily basis for over a year and a half, culminating in an ultimatum, " 'F— me or you're fired,' " when the employee never yielded to his demands. She testified that her employer's "behavior was deeply offensive to her, altogether unsolicited, and that she regularly told the Defendant to leave her alone." Co-workers observed the employer's actions and corroborated the employee's allegations.

The court, in reviewing the employee's claims, expressed its satisfaction that she never encouraged her employer's verbal and physical advances, as she repeatedly pushed him away and told him to stop. Moreover, the employee tried to avoid any confrontation with her employer, and she certainly avoided meeting with him alone by requesting that the door to his office remain open while she was inside. The court stated:

"It is instructive to review what other courts have found when considering motions to dismiss within the context of the conduct alleged: courts considering emotional-distress counts similar to the one at bar consistently have held that the allegations sufficient to state a claim for sexual harassment are sufficient to state a claim for emotional distress, and have generally found what one court called 'a common thread—a continued course of sexual advances, followed by refusals and ultimately, retaliation.' *Shaffer v. National Can Corp.*, 565 F.Supp. 909, 915 (E.D.Pa.1983). As phrased in *Fawcett v. IDS Financial Services*, 41 [Fair Empl.Prac.Cas. (BNA)] 589, 593, 1986 WL 9877 (W.D.Pa.1986), which involved sexual propositions and the touching of a female employee:

" 'Other district courts have held that cases in which a supervisor has conducted a continued course of sexual advances and harassment, followed by refusals by the employee, and retaliation by the supervisor in the form of denying promotions or making the atmosphere of the work place oppressive, involved conduct that is sufficiently outrageous to state a cause of action for intentional infliction of

emotional distress.'" *Id.*, 791 F.Supp. at 1555, fn. 4; see, also, *Shrout v. Black Clawson Co.* (S.D.Ohio 1988), 689 F.Supp. 774, 781, citing *Meritor* (inherent in a *quid pro quo* sexual harassment suit, an element of which is that the employee's submission to the sexual conduct must be an express or implied condition for receiving job benefits, "is the notion that the very power of the supervisor to coerce his subordinate derives from the cloak of authority placed upon him by the employer").

This court fails to find that *Stockett* is definitive with regard to the issues before us. Tschantz's claim is particularly distinct because it deals not only with the direct conduct of an employer himself, but with the employer's influence upon an employee through the use of other employees of the State Auditor's Office. According to Tschantz, Ferguson was directly or indirectly, specifically through Beight and Schumann, in a position of influence over her. Also as distinguished from *Stockett*, Tschantz did not repeatedly reject Ferguson's demands, nor did she voice her objection to the demands. Rather, she relies upon the inherent authority of an employer to argue that it was her knowledge of the authority that forced her to succumb without negative reaction to Ferguson's desires.

When construing the evidence in favor of Tschantz, which we are required to do under Civ.R. 56(C), the following facts present themselves. Tschantz's employment with the State Auditor's Office commenced in February 1977. One year later, she received a promotion, even though her superiors earlier recommended her dismissal. Tschantz later learned from Beight that he was responsible for her retention and subsequent promotion. Tschantz, intimidated by Beight, thereafter participated in a sexual relationship with him.

Tschantz met Ferguson for the first time in September 1978. Her next four promotions, in November 1979, September 1980, April 1981, and October 1981 were received after this meeting and while Tschantz was sexually involved with Beight.

Several months after her fifth promotion, Schumann, Ferguson's chauffeur, contacted Tschantz and directed her to meet with "the boss" at a Cleveland motel. Tschantz did so, and after dining with Schumann and Ferguson, returned to her room accompanied by Ferguson, who followed her inside the room.

Ferguson's and Tschantz's sexual relationship began in this motel room and lasted for over three years. Tschantz estimated they had intercourse approximately fifty times in the three-year period. Tschantz also received her final promotion to that of Regional Administrator during this period and was obligated to enforce contribution guidelines as part of the position.

Though Tschantz expressly stated during her deposition that Ferguson never personally threatened her, she further testified that Ferguson did not have to

personally threaten her for her to either fear or be threatened by him. Not only was she advised "to do as the boss says" by other State Auditor's Office employees, but she also "felt" the threat because, as a long-time employee of that office, she knew how Ferguson operated the office. She also asserted that she had been apprised by Ferguson himself that he was the ultimate decisionmaker in the office and thus possessed the power to terminate her employment if she did not do "as the boss says."

With regard to the delay in ending her relationship with Ferguson, Tschantz related that she terminated the relationship when she gathered enough courage to do so. Not only was she afraid of retribution, but she found herself financially attached to the job. Dr. Sutker confirmed that Tschantz could not gather herself psychologically to end the relationship any earlier. Dr. Sutker also offered his opinion that Tschantz did not participate in the relationship so as to "climb the state auditor's office ladder," contrary to Ferguson's assertion. Rather, the doctor stated that at a young age, Tschantz learned that she had to comply with the demands, sexual or otherwise, of someone in authority in order to survive.

Based upon the foregoing factual allegations, this court is not prepared to say that reasonable minds can come only to the conclusion that Ferguson's conduct was not outrageous. Tschantz claimed that Ferguson knew of her submission to Beight's sexual advances for which she received promotions. Armed with this knowledge, Ferguson directed his chauffeur to arrange a meeting with Tschantz at a motel where she was to stay the night; followed her into her room where she eventually succumbed to his sexual advances; directed her to meet him on approximately forty-nine other occasions in the next three years so as to engage in sexual intercourse; promoted her to Regional Administrator during the relationship; ordered her to enforce his employee contribution quotas; and, when Tschantz ended the relationship, ordered her followed and investigated,[2] ultimately leading to her personal leave of absence. Ferguson's position is that he and Tschantz were involved in an affair and that she fully consented to its existence without complaint. Tschantz, on the other hand, maintained that Ferguson used her as a "sex slave" without any emotional attachment and used the power of his office to satisfy his personal desires. In our view, reasonable minds can come to differing conclusions as to whether Ferguson's conduct was extreme and outrageous so as to support Tschantz's claim. Although each of the alleged individual acts attributable to Ferguson,

---

2. Ferguson claims that the investigation stemmed from Tschantz's alleged misuse of a state vehicle. Tschantz claims that Ferguson knew of and permitted the state vehicle usage, and the investigation, therefore, was directly related to her ending the relationship. This court cannot ignore that this allegation alone by Tschantz creates an issue of fact as to Ferguson's conduct.

directly and indirectly, is probably not actionable, the combination of the acts "may make it sufficiently outrageous that a jury could reasonably find in [Tschantz's] favor on the emotional distress allegation." *Collins v. Willcox, Inc.* (1992), 158 Misc.2d 54, 57, 600 N.Y.S.2d 884, 886; see, also, *Davis v. Black* (1991), 70 Ohio App.3d 359, 591 N.E.2d 11 (giving plaintiff the benefit of the construction of the evidence in her favor, it was a combination of factors, *i.e.*, sexual harassment, reduction of hours upon complaint, and ultimate discharge, which gave rise to claim for intentional infliction of emotional distress); *McDaniel v. Gile* (1991), 230 Cal.App.3d 363, 281 Cal.Rptr. 242 (extreme and outrageous character of conduct may arise from abuse of a position which gives actual or apparent authority over the other; it may also arise from actor's knowledge that the other is peculiarly susceptible to emotional distress)[3]; *Brown v. Denny* (1991), 72 Ohio App.3d 417, 594 N.E.2d 1008; cf. *Adams v. Gen. Motors Corp.* (Aug. 12, 1993), Franklin App. No. 93AP-173, unreported, 1993 WL 310420 (three comments and one gesture made by supervisor, though flirtatious and possibly irksome, did not amount to extreme and outrageous conduct in light of lack of evidence regarding physical contact between plaintiff and her supervisor and a threat to her job security if she did not acquiesce to the supervisor's sexual advances).

As to Ferguson's intent or knowledge, the Supreme Court of Ohio in *Russ v. TRW, Inc.* (1991), 59 Ohio St.3d 42, 570 N.E.2d 1076, was called upon to determine whether liability for intentional infliction of emotional distress may result only from the employer's specific desire to injure an employee, or the employer's knowledge that such harm was substantially certain to occur. *Id.* at 47, 570 N.E.2d at 1082. The court decided:

" * * * an action for infliction of emotional distress is cognizable irrespective of the particular mental state of the tortfeasor. This court has recognized that *behavior of an intentional, reckless or negligent character resulting in such injury is actionable.*[4] See *Yeager v. Local Union 20, supra; Reamsnyder v. Jaskolski* [1984], *supra* [10 Ohio St.3d 150, 10 OBR 485, 462 N.E.2d 392]; *Schultz v. Barberton Glass Co.* (1983), 4 Ohio St.3d 131, 4 OBR 376, 447 N.E.2d 109. * * *" (Emphasis and footnote added.) *Id.* at 48, 570 N.E.2d at 1083.

---

3. *McDaniel* is distinguishable from the instant case insofar as it does not involve an employer/employee relationship. However, we cite it merely to analyze the trial court's conclusion herein that Tschantz failed to provide sufficient evidence demonstrating questions of fact existed as to whether Ferguson's conduct was extreme and outrageous.

4. The caveat to this recognition, however, is that Ohio courts do not recognize a separate tort for negligent infliction of emotional distress in the employment context. See discussion, *infra*, in Tschantz's second assignment of error.

Further, the Restatement at 77, Section 46, Comment *i*, defines "intention" as knowledge that severe emotional distress "is certain, or substantially certain, to result from his conduct," and defines "recklessness" as a "deliberate disregard of a high degree of probability that emotional distress will follow." See *Clifton v. Van Dresser Corp.* (1991), 73 Ohio App.3d 202, 208–209, 596 N.E.2d 1075, 1079.

Based upon Tschantz's allegations outlined *supra*, this court finds that a reasonable person may not only differ as to whether Ferguson's conduct was extreme and outrageous, but also as to whether such conduct manifested the requisite intent. Ferguson's defense that he intended no harm may be contradicted by the instances of his conduct as Tschantz's employer.

Finally, Dr. Sutker's deposition testimony fully supports the remaining two elements of an intentional infliction of emotional distress claim. The doctor expressly testified there was a direct causal link between Ferguson's conduct and Tschantz's depression. Dr. Sutker also testified that Tschantz was not only incapable of productive work at the time of the deposition, but that she may be permanently disabled and in need of continued psychotherapy and drug therapy, "a significant part of which is a result of Mr. Ferguson's conduct." See *Russ*, 59 Ohio St.3d at 47, 570 N.E.2d at 1082 (proximate cause of the emotional distress suffered by plaintiff not limited to mere fact of his eventual discharge; "[r]ather, the circumstances surrounding his discharge, including appellant's [TRW's] false characterization of appellee as an instigator of and willing participant in the [illegal] pricing practices, were in large part the basis for the trauma which he experienced"); cf. *Plikerd v. Mongeluzzo* (1992), 73 Ohio App.3d 115, 596 N.E.2d 601 (deposition testimony of the plaintiffs discloses that she neither sought nor received medical, psychiatric, or psychological treatment, missed any work or incurred any expense for treatment of emotional distress resulting from the incidents alleged to have happened); *Packer v. Williams* (Jan. 12, 1990), Lucas App. No. L–89–105, unreported, 1990 WL 1348 ("extreme emotional distress" and "intent" to cause emotional distress not demonstrated where plaintiff never received treatment for her depression or nervousness, and defendant was simply unable to control his emotions in plaintiff's presence).

In our opinion, final determination of the instant case should be delayed pending further discovery and factual developments at trial. We, therefore, agree with Tschantz's allegation that the trial court's grant of summary judgment denied her right to trial under the Fourteenth Amendment. An individual's right to a jury trial is not abridged by the proper granting of a motion for summary judgment. *Houk v. Ross* (1973), 34 Ohio St.2d 77, 83–84, 63 O.O.2d 119, 122–123, 296 N.E.2d 266, 270–271; *Univ. Carnegie Med. Partners v. Cleveland Therapy Ctr., Inc.* (Oct. 15, 1992), Cuyahoga App. Nos. 61016 and 61463, unreported, 1992 WL 292270; *Sawchyn v. Buckeye Union Ins. Co.* (May 4, 1992), Cuyahoga App.

No. 60510, unreported, 1992 WL 104293. As we find the trial court's granting of summary judgment was improper, Tschantz was denied her right to a trial.

Appellant's first assignment of error is sustained.

For her second assignment of error, Tschantz submits that the trial court erred in granting summary judgment in favor of Ferguson on her claim of negligent infliction of emotional distress. She argues that Ferguson, as her "top boss" and in a position of authority and power, abused that position by compelling her to engage in sex on demand and to violate R.C. 124.57, Ohio's Campaign Contribution Statute.

Ohio courts do not recognize a separate tort for negligent infliction of emotional distress in the employment context. *Hatlestad v. Consol. Rail Corp.* (1991), 75 Ohio App.3d 184, 598 N.E.2d 1302; *Antalis v. Ohio Dept. of Commerce* (1990), 68 Ohio App.3d 650, 589 N.E.2d 429. Generally, recoveries in actions for this form of emotional distress have been restricted to very limited situations, namely situations involving automobile accidents. *Schultz v. Barberton Glass Co.* (1983), 4 Ohio St.3d 131, 4 OBR 376, 447 N.E.2d 109; *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 6 OBR 114, 451 N.E.2d 759. This court has refused to expand recovery to breach of sales contract cases, *Brown Deer Restaurant, Inc.*, and libel actions, *Dowell.* Therefore, a plaintiff may only recover for emotional harm negligently inflicted by a defendant by instituting a "traditional" claim for negligent infliction of emotional distress. *Hatlestad*, 75 Ohio App.3d at 191, 598 N.E.2d at 1306–1307. The plaintiff will then be required to show that he or she (1) was a bystander to an accident, (2) reasonably appreciated the peril thereof, and (3) suffered serious and foreseeable emotional distress as a result of his cognizance or fear of the peril. *Paugh,* paragraphs three and four of the syllabus. Tschantz's allegations against Ferguson do not meet the required elements. As stated by the court in *Antalis,* "absent a clear expression of intent from the Ohio Supreme Court, we decline to expand the application of this tort to include actions arising out of an employment situation." *Antalis,* 68 Ohio App.3d at 654, 589 N.E.2d at 431.

Appellant's second assignment of error is overruled.

In her third and fourth assignments of error, Tschantz maintains that the trial court erred in granting a protective order to Ferguson pertaining to his personal financial status. Tschantz sought to attain through pretrial discovery Ferguson's income tax returns for the years 1982 through 1986, and deeds to any real properties owned by him or for which he held title. Tschantz would then use this information when presenting her punitive damages claim to the jury.

Civ.R. 26(B)(1) defines generally the scope of discovery and states in part:

"Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party. * * * "

██ Civ.R. 26(B)(1) grants broad discovery powers to parties. Although the rule limits the matter to be discovered to that which is "relevant to the subject matter," Civ.R. 26(B)(1) also provides for discovery of information "reasonably calculated to lead to the discovery of admissible evidence." The test for relevancy under Civ.R. 26(B)(1) "is much broader than the test to be utilized at trial. It is only irrelevant by the discovery test when the information sought will not reasonably lead to the discovery of admissible evidence." *Icenhower v. Icenhower* (Aug. 14, 1975), Franklin App. No. 75AP–93, unreported, at 2; see, also, *State ex rel. Fisher v. Rose Chevrolet* (1992), 82 Ohio App.3d 520, 523, 612 N.E.2d 782, 784.

██ In the instant case, Ferguson did not claim privilege with regard to the information sought to be discovered by Tschantz. Rather, he relied upon Civ.R. 26(C), which reads:

"(C) Protective orders. Upon motion by any party or by the person from whom discovery is sought, *and for good cause shown,* the court in which the action is pending may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had; * * * (4) that certain matters not be inquired into, or that the scope of discovery be limited to certain matters; * * * (6) that a deposition after being sealed be opened only by order of the court * * *." (Emphasis added.)

Pursuant to this rule, a trial court has inherent authority to regulate discovery. *State ex rel. Grandview Hosp. Ctr. v. Gorman* (1990), 51 Ohio St.3d 94, 554 N.E.2d 1297. Civ.R. 37 reinforces this inherent authority by affording courts the ability to impose sanctions upon those persons who unjustifiably seek or resist discovery.

The Supreme Court of Ohio in *Wagner v. McDaniels* (1984), 9 Ohio St.3d 184, 9 OBR 469, 459 N.E.2d 561, held that evidence of a defendant's net worth may be considered by a factfinder when determining a punitive damages award. *Id.,* paragraph two of the syllabus. The court came to this conclusion by initially examining the law from other jurisdictions and observing that net worth evidence is not *necessary* to award damages to a prevailing party. *Id.* at 186–187, 9 OBR at 470–471, 459 N.E.2d at 563–564. The *Wagner* court, therefore, cited 22 American Jurisprudence 2d (1965), Damages, Section 322, which reads:

" 'Evidence of the financial condition of the defendant is admissible and may be considered by the jury in determining the amount of exemplary or punitive damages to be allowed and what amount of punishment would be inflicted thereby on the theory that the allowance of a given sum would be a greater punishment to a man of small means than to one possessing larger wealth.' " *Wagner* at 187, 9 OBR at 471, 459 N.E.2d at 563; see, also, *TXO Production Corp. v. Alliance Resources Corp.* (1993), 509 U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366; *Pacific Mut. Life Ins. Co. v. Haslip* (1991), 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1.

Nonetheless, in the present case, Ferguson submits that the trial court properly issued the protective order and overruled Tschantz's motion to compel discovery as to his financial holdings, since Tschantz did not make out a *prima facie* case of a legal right to punitive damages. He cites decisions from other jurisdictions to support the propriety of the trial court's stance and his proposition that Tschantz had to make a "factual showing of a viable claim for punitive damages before any discovery of financial status is permitted."

■ Evidentiary rulings lie within the broad discretion of a trial court. Evid.R. 103(A) and 104(A). Absent an abuse of that discretion which amounts to prejudicial error, such rulings do not form the basis for reversal upon appeal. See *State v. Lundy* (1987), 41 Ohio App.3d 163, 535 N.E.2d 664.

■ Pertaining to the issues before us in Tschantz's third and fourth assignments of error, though evidence of a party's net worth is admissible to be considered by a jury in assessing a punitive damages award, it is not required evidence. See *TXO Production Corp; Haslip; Wagner.* We, therefore, find no abuse of discretion on behalf of the trial court as a result of its granting a protective order in favor of Ferguson with regard to the furnishing of personal financial information. By doing so, however, we do not reach the issue whether such a ruling would remain appropriate should Tschantz make a sufficient showing in further proceedings in this case.

Appellant's third and fourth assignments of error are overruled.

For her fifth assignment of error, Tschantz asserts that the trial court erred in denying her motion to compel Ferguson to respond to questions propounded to him during his deposition. Specifically, Ferguson was questioned about his sexual involvement with other individuals employed in the State Auditor's Office. Ferguson, arguing now the questions were irrelevant to Tschantz's claim, refused to answer the questions on the advice of counsel.

■ As stated above, Civ.R. 26(B)(1) allows broad discovery. Discoverable material is restricted to relevant evidence in a particular case, but irrelevancy is determined only under Civ.R. 26(B)(1) when the information sought will not

reasonably lead to the discovery of admissible evidence. *Icenhower*; see, also, *Rose Chevrolet.*

Moreover, all relevant evidence is admissible at trial. Evid.R. 402. "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401.

Evidence of other crimes, wrongs, or acts is inadmissible to prove the character of a person in order to show that he or she acted in conformity therewith. Evid.R. 404(B). In other words, evidence of other crimes, wrongs or acts is not admissible to prove the person committed the act for which he or she is accused. This type of evidence is, however, admissible for other purposes such as proof of intent. *Id.*

This court, keeping in mind that this case was summarily disposed of before trial, finds the trial court erred in not ordering Ferguson to respond in a limited manner to Tschantz's questions during his deposition. Our decision that the trial court erred in overruling Tschantz's motion to compel is connected to that portion of her intentional infliction of emotional distress claim relating to Ferguson's intent and knowledge and not to whether he acted in conformity with previous conduct. Stated differently, the trial court should have allowed protected, limited discovery,[5] as to whether Ferguson was involved with any other employee(s), *and* whether the other employee(s) reacted in a manner similar to Tschantz. If so, this information could affect the element of Ferguson's intent and knowledge as permitted by Evid.R. 404(B) because he may have been alerted to the harm caused by his conduct. Cf. *Hall v. Gus Constr. Co., Inc.* (C.A.8, 1988), 842 F.2d 1010; *Hicks v. Gates Rubber Co.* (C.C.A.10, 1987), 833 F.2d 1406; *Stockett* (all standing for proposition that evidence tending to show a defendant's harassment of other women working alongside the plaintiff is directly related to whether the defendant created an environment violative of Title VII).

Appellant's fifth assignment of error is sustained.

*Judgment reversed*
*and cause remanded.*

PORTER and PARRINO, JJ., concur.

THOMAS J. PARRINO, J., retired, of the Eighth Appellate District, sitting by assignment.

---

5. Since this assignment of error deals with pretrial discovery, just because Tschantz should have been allowed to depose Ferguson as discussed, it does not necessarily follow that the discovery will reveal admissible evidence. Adequate provision for the privacy of any employee can be drawn from the court's broad powers under Civ.R. 26(C).