TAKACH, Appellant,

v.

AMERICAN MEDICAL TECHNOLOGY, INC. et al., Appellees.

[Cite as *Takach v. Am. Med. Technology, Inc.* (1998), 128 Ohio App.3d 457.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 72247.

Decided Feb. 19, 1998.

458

*Lancione & Simon, P.L.L., Ellen S. Simon* and *Cathleen M. Bolek,* for appellant.

*Walter & Haverfield, P.L.L., Michael T. McMenamin* and *Nancy A. Noall,* for appellees.

James D. Sweeney, Judge.

Plaintiff-appellant Jacqueline Takach ("Takach"), born February 12, 1952, appeals from the granting of summary judgment in favor of defendants-appellees-movants American Medical Technology, Inc. ("AMT"), George J. Picha, M.D. ("Dr. Picha"), and Western Reserve Plastic Surgery, Inc. ("Plastic").[1] For the reasons adduced below, we affirm.

---

1. Dr. Picha owns and operates AMT and Plastic.

A review of the record on appeal indicates that the action involves claims for sexual harassment, wrongful discharge from employment, and intentional infliction of emotional distress.

In both 1972 and 1982, Takach underwent breast implant reconstructive surgery using silicone implants. Since 1979, she has been employed as a plastic surgery nurse. In 1988, she was hired by Dr. Picha, a plastic surgeon, to work in his private clinical practice on a part-time basis of approximately twenty to twenty-five hours per week.

In April and August 1990, Dr. Picha surgically removed the silicone implants from Takach.[2] After this first breast surgery, Takach consulted with attorneys Thomas Heffernan and Peter Brodhead of the firm Spangenberg, Shibley, Traci, Lancione & Liber, relative to her legal rights concerning a potential products liability lawsuit against the manufacturer of her silicone implants, Dow Corning. Shortly after the second breast surgery in August 1990, Takach advised Dr. Picha that she intended to pursue a lawsuit against Dow Corning. Takach's lawsuit against Dow Corning was filed in July 16, 1991, by the attorneys whom she had previously consulted.

In November 1991, Dr. Picha was notified of a request to take his deposition in the Takach/Dow Corning case. On January 9, 1992, there were further communications regarding the scheduling of Dr. Picha's deposition for January 24, 1992.[3]

In January 1992, Dr. Picha changed Takach' job duties by restricting Takach from any involvement with cases in the office involving breast implants, which account for approximately five percent of the medical practice. Unbeknownst to Dr. Picha at the time, Takach in 1992 began working part-time at the Spangenberg law firm, principally working for attorney Brodhead, who represented her in her case against Dow Corning. Dr. Picha first became aware of Takach's employment with Spangenberg when he read Takach's May 8, 1996 deposition in the case *sub judice.*

In February 1994, Dr. Picha, with the consultation and concurrence of other doctors and the office manager (Ms. O'Sullivan) in the practice, further restricted Takach's job duties by reassigning some of those duties to another nurse, Linda

2. In April 1990, Takach also had Dr. Picha perform liposuction on her thighs and knees and a scar revision on an incision site from a prior cesarian birth.

3. Dr. Picha testified in his deposition in this case that he conducted research for Dow Corning from 1986 to 1991 in the field of silicone breast implants and was the inventor and patent holder of the micro-structured surface design used in silicone breast implants which were manufactured and sold by Dow Corning from 1988 to 1992. This research led to paid promotions of this implant by Dr. Picha for Dow Corning throughout the United States and Europe and the payment of royalty fees by Dow Corning to Dr. Picha when he sold the patent to the manufacturer.

Widmer, after a new physician, Dr. Robert Gerding, joined the practice that month. Nurse Widmer came with Dr. Gerding as part of Dr. Gerding's practice. The principal effect of the reduction and/or reassignment of job duties for appellant was less direct involvement with patients and more involvement with paperwork and records.

On Sunday, May 15, 1994, Takach left her employment with the defendants herein. In her deposition, Takach stated that she quit because she had received and accepted an offer of full-time employment with the Spangenberg firm. Takach's letter of resignation, which was hand-delivered by Takach to Dr. Picha at his home on May 15, 1994, made no mention of sexual harassment as a reason for quitting.

Takach, represented by the Spangenberg firm, filed the action *sub judice* one year later on May 15, 1995. Exhaustive discovery practice was conducted by the parties. Defendants filed their motion for summary judgment, with attached evidence, on November 15, 1996. Takach filed her brief in opposition to summary judgment, with attached evidence, on January 10, 1997. Defendants filed a reply brief on January 22, 1997. On February 26, 1997, the trial court issued its judgment entry granting summary judgment on all claims. Takach filed her notice of appeal from this final order on March 27, 1997. Three assignments of error are presented for review, each arguing that summary judgment was improperly granted as to one of the three specific causes of action.

The standard of review for a motion for summary judgment was generally stated in *State ex rel. Zimmerman v. Tompkins* (1996), 75 Ohio St.3d 447, 448–449, 663 N.E.2d 639, 640–641, as follows:

"Civ.R. 56(C) provides that before summary judgment may be granted, it must be determined that (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made. *State ex rel. Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377, 1379, citing *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274.

"* * *

"Summary judgment is appropriate where the nonmoving party does not produce evidence on any issue for which that party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus; *State ex rel. Morley v. Lordi* (1995), 72 Ohio St.3d 510, 513, 651 N.E.2d 937, 940. When a motion for

summary judgment is made and supported as provided in Civ.R. 56, the nonmoving party may not rest on the mere allegations of his pleading, but his response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing that there is a genuine triable issue. Civ.R. 56(E); *Jackson v. Alert Fire & Safety Equip., Inc.* (1991), 58 Ohio St.3d 48, 52, 567 N.E.2d 1027, 1031."

See, also, *Celotex v. Catrett* (1986), 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265.

Subsequent to *Tompkins,* in the recent case of *Kulch v. Structural Fibers, Inc.* (1997), 78 Ohio St.3d 134, 144–145, 677 N.E.2d 308, 316–317, the Ohio Supreme Court limited paragraph three of the syllabus of *Wing, supra,* by reasserting reliance on *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 273–274:

"[A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, *the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied.* However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." (Footnote omitted; emphasis *sic.*)

■ In our review of the motion for summary judgment, we are also mindful that such appellate review is *de novo. Koos v. Cent. Ohio Cellular Inc.* (1994), 94 Ohio App.3d 579, 641 N.E.2d 265.

We now turn to the appellant's assignments of error.

I

"The trial court erred in granting summary judgment with regard to plaintiff's public policy wrongful discharge claim."

■ The wrongful discharge claim is premised on appellant's belief that her reassignment of job duties and eventual termination of employment with Dr.

Picha, due to the allegedly intolerable and hostile work environment, were an act of retaliation for her having utilized the legal process in filing a products liability action against Dow Corning.

■ A claim for wrongful discharge based on a violation of public policy is recognized in Ohio as an exception to the common-law employment-at-will doctrine and contains four *prima facie* elements which must be demonstrated:

"1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

"2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).

"3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).

"4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element)." (Emphasis *sic.* ) *Painter v. Graley* (1994), 70 Ohio St.3d 377, 384, 639 N.E.2d 51, 56–57, fn. 8, reconsideration denied (1994), 70 Ohio St.3d 1477, 640 N.E.2d 849; see, also, *Kulch, supra; Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 652 N.E.2d 653; and *Greeley v. Miami Valley Maint. Contractors, Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981.

Takach bases this particular cause of action on the alleged violation of the "Open Courts" provision of the Ohio Constitution, which provides in pertinent part:

"All courts shall be open, and every person, for an injury done him in his land, goods, person or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay." Section 16, Article I, Ohio Constitution.

A review of the jurisprudence of this state reveals that no court has had cause to decide whether the cause of action herein, discharging an employee because the employee filed a civil lawsuit against a third-party which affected the business interests of the employer, is in violation of the Open Courts element. As recognized by both parties, other jurisdictions have addressed this very issue and their determinations prove illustrative in that no jurisdiction has applied substantially similar Open Courts constitutional provisions to this cause of action except where the employee's claim against the employer was statutorily protected, which exception is not relevant to the case *sub judice.* See *Beam v. IPCO Corp.* (C.A.7, 1988), 838 F.2d 242 (the public policy of Wisconsin is not violated where an employee is terminated for bringing, or threatening to bring, legal action against the employer); *Deiters v. Home Depot U.S.A., Inc.* (M.D.Tenn. 1993), 842

F.Supp. 1023 (at-will employee who is terminated for suing their private employer precluded from claiming that such termination violated public policy); *Whitman v. Schlumberger Ltd.* (N.D.Cal. 1992), 793 F.Supp. 228 (the public policy of California is not violated where an employee is terminated for threatening to, and then bringing, a lawsuit against the employer); *Kavanagh v. KLM Royal Dutch Airlines* (N.D.Ill. 1983), 566 F.Supp. 242 (Open Courts provision not violated where private employer takes steps to penalize the employee from suing the employer); *Groce v. Foster* (Okla. 1994), 880 P.2d 902 (wrongful discharge claim held in violation of public policy where the employee was terminated for having filed a statutorily protected claim for workers' compensation benefits); *Mitchell v. Deal* (1993), 241 Ill.App.3d 331, 182 Ill.Dec. 75, 609 N.E.2d 378, appeal denied (1993), 151 Ill.2d 566, 186 Ill.Dec. 384, 616 N.E.2d 337 (public policy of Illinois not violated where the at-will employee was terminated after filing suit against the employer, who was not covered under workers' compensation law, for injuries sustained on the job); *Boykins v. Hous. Auth. of Louisville* (Ky. 1992), 842 S.W.2d 527 (summary judgment against the employee affirmed where the employee had sued the employer for negligence unrelated to the employment [the employee's minor son had sustained a personal injury] and the employer terminated the employee: no public policy evidenced by constitutional or statutory provision which prohibits the employer-housing authority for discharging the employee in retaliation for the employee filing suit against the employer); *Watson v. Peoples Sec. Life Ins. Co.* (1991), 322 Md. 467, 588 A.2d 760 (public policy of Maryland not violated where employee was terminated after having filed a civil suit against a co-worker with a claim against the employer for negligent retention/supervision of the co-worker); *Alexander v. Kay Finlay Jewelers, Inc.* (1986), 208 N.J.Super. 503, 506 A.2d 379, appeal denied (1986), 104 N.J. 466, 517 A.2d 449 (public policy of New Jersey not violated where employee was terminated after having filed a lawsuit to recover the balance of salary allegedly due in a dispute over the terms of a pre-employment agreement). See, also, *Briner v. Natl. City Bank* (Feb. 17, 1994), Cuyahoga App. No. 64610, unreported, 1994 WL 50673, at 4–5 (Open Courts provision of the Ohio Constitution not violated where employee was terminated for having admitted in deposition testimony that he had secretly tape recorded the conversations of other co-workers).

Appellant cites to two cases in support of her argument. In *Simonelli v. Anderson Concrete Co.* (1994), 99 Ohio App.3d 254, 650 N.E.2d 488, the employee alleged wrongful discharge in violation of public policy in having consulted with and retained the services of an attorney in a work-related disciplinary action. The trial court granted summary judgment in favor of the employer. The appellate court, relying on *Thompto v. Coborn's Inc.* (N.D.Iowa 1994), 871 F.Supp. 1097 (a case which was also cited by appellant herein), and without ruling on the merits of the claim, concluded that summary judgment was improperly

granted and determined that discharging an employee for having consulted with an attorney could serve as a public-policy exception to the common-law employment-at-will doctrine. The court remanded the matter because there were genuine issues of fact remaining as to whether the employee was, in fact, fired for consulting an attorney. We find *Simonelli* to be distinguishable because *Simonelli* involved the right to consult an attorney, which is not a claim in the present case, and the opinion at no point discussed the application of the Open Courts provision which is central to this assignment of error. We also note that the Ohio Supreme Court has declined to create an exception to the common-law employment-at-will doctrine for an employer's alleged violation of the Ohio Constitution. *Provens v. Stark Cty. Bd. of Mental Retardation & Dev. Disabilities* (1992), 64 Ohio St.3d 252, 261, 594 N.E.2d 959, 965–966.

Having failed to demonstrate the first element of the existence of a clear public policy under *Painter,* we conclude that the trial court properly granted summary judgment on this cause of action.

The first assignment of error is overruled.

## II

■ "The trial court erred in granting summary judgment with regard to plaintiff's sexual harassment claim."

■ In order to recover on a claim for sexual harassment in the workplace, the employee seeking recovery must demonstrate five elements:

"(1) That the employee was a member of a protected class; (2) That the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; (3) That the harassment complained of was based on sex; (4) That the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in tangible job detriment; and (5) The existence of *respondeat superior* liability." *Schmitz v. Bob Evans Farms, Inc.* (1997), 120 Ohio App.3d 264, 273, 697 N.E.2d 1037, 1042, citing *Kauffman v. Allied Signal, Inc.* (C.A.6, 1992), 970 F.2d 178, and *Highlander v.. KFC Natl. Mgt. Co.* (C.A.6, 1986), 805 F.2d 644, 648.

In analyzing the harassing conduct complained of, it is noted:

"Title VII of the Civil Rights Act of 1964 prohibits discrimination 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's * * * sex.' 42 U.S.C. § 2000e–2(a)(1). In *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49, 59 (1986), the Supreme Court held that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a hostile

or abusive work environment. Indeed, the statute grants employees 'the right to work in an environment free from discriminatory intimidation, ridicule, and insult.' *Id.* at 65, 106 S.Ct. at 2405 [91 L.Ed.2d at 59].

"However, the Court emphasized in *Meritor* that not all workplace conduct that has sexual overtones can be characterized as harassment forbidden by the statute. *See id.* at 67, 106 S.Ct. at 2406–06 [91 L.Ed.2d at 59–60]. Rather, harassment must affect a 'term, condition, or privilege' of employment in order for it to fall within Title VII's purview. Thus, for alleged harassment to be actionable, it must be 'sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment."' *Id.* (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)).

"In *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–23, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993), the Supreme Court reaffirmed this standard and elaborated upon its contours. The *Harris* Court explained that the conduct in question must be judged by both an objective and a subjective standard: The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive. *Id.* at 21–22, 114 S.Ct. at 370–71 [126 L.Ed.2d at 302]. 'This standard * * * takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury.' *Id.* at 21, 114 S.Ct. at 370 [126 L.Ed.2d at 302]. Acknowledging that this approach is not susceptible to a 'mathematically precise test,' *id.* at 22, 114 S.Ct. at 371 [126 L.Ed.2d at 302], the Court then sought to provide some guidance with regard to the somewhat elusive question of whether a work environment was objectively hostile or abusive. The Court explained that all of the circumstances should be considered, and it suggested a non-exhaustive list of relevant factors:

"[T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." *Id.* at 23, 114 S.Ct. at 371 [126 L.Ed.2d at 302–303]. *Black v. Zaring Homes, Inc.* (C.A.6, 1997), 104 F.3d 822, 825–826.

The allegedly harassing conduct complained of by appellant includes a large variety of examples detailed in her deposition. In discussing these examples, it is noted that except for one alleged incident involving the doctor placing his hand under her sweater while dancing at an office Christmas party, appellant, at no

time contemporaneous with the conduct complained of, complained to anybody about the conduct.[4]

The first example occurred in 1991 at a plastic surgeons' medical seminar in Seattle, Washington, which was attended by Dr. Picha and several members of his practice, including the appellant. Dr. Picha told the appellant that (1) he loved her, (2) that he was going places in the field of, and the professional associations of, plastic surgery, and (3) that he wanted to take her with him. Appellant alleges that the utterance "he loved her" was sexual harassment. Appellant did not consider this utterance to be harassment; instead, she took no offense and was flattered by the comment. Appellant admits that the doctor made no sexual advance at that time.

The second example also occurred during that same 1991 seminar trip to Seattle, where the party from the office was exiting a taxi. At that time, Dr. Picha took a taxi sticker from the cab and stuck it onto the appellant's derriere. Then Dr. Picha got down on the ground so as to photograph the taxi sticker from below waist level. The appellant does not know why the doctor did this, and admits that she was not too upset at the time of the conduct. Further, the appellant admits that she was more upset that the doctor elected to get on the ground to obtain the shot. So, it appears that the conduct complained of stems not from using her bottom as a billboard, but from the doctor's choice of an unflattering angle for taking the photograph.

The third example is the alleged conduct from an office Christmas party where the appellant, at "someone's request," sat on the doctor's lap for a photograph. Appellant, apart from being unable to identify the doctor as the person telling her to sit on his lap, admits that the doctor did not touch her in an inappropriate manner during this photograph session.

The fourth example concerns the doctor's making observations and comments about appellant's personal appearance, including weight, appearance of tan lines on her person (and others) after a vacation, cosmetic makeup, the benefits of physical exercise, and the choice of hosiery with a particular dress. Takach admits that she did not know what motivated the doctor to make these observations. Given the fact that the medical practice involved plastic surgery, it would be hard to imagine a place of business and a class of employees more conscious to the outward manifestations of accepted physical beauty. It comes as no surprise that a worker therein would make observations such as these in the regular course of banter between co-workers. Also, the record is clear that Takach was a

---

4. Appellant, in the sweater episode, believes that pushing the doctor away, telling the doctor "in your dreams," and walking out of the party were an expression of complaint to the doctor over his conduct at that party.

patient of Dr. Picha on several occasions involving the alteration of various body parts which are customarily private in nature and which surgeries were performed to alter and/or enhance appellant's physical appearance (liposuction of the thighs and knees, scar revisions, and breast augmentation). It is not surprising that Dr. Picha, as her personal plastic surgeon with an intimate knowledge of the patient's history and her attention to her appearance, was concerned about his patient's physical appearance and would make observations relative to that appearance: Observations which, taken alone, do not evidence a sexual advance. Also, the record demonstrates (1) that the staff of the office indulged in conversation relating to peoples' physical manifestations, (2) that the office staff enjoyed an easygoing interpersonal style in their office dealings with one another, and (3) that the office atmosphere maintained a joking manner. Based on the *Harris* factors and the context in which these observations were made, we cannot conclude that these observations by the doctor were sexually charged at the time they were made or created an abusive work environment.

The fifth example of allegedly harassing conduct is the doctor's advising the appellant to "relax" and "loosen up." Appellant admits that she did not know what the doctor expected in uttering these suggestions, because she believed that her actions in the office were professional. These utterances, taken alone, do not manifest a sexual motivation by the doctor. Instead, the record reveals that at the time of these comments, Takach was the subject of a great deal of stress in her personal and professional life and these suggestions, though arguably unwelcomed by the listener, were not sexual advances, but were uttered out of a regard for her mental well-being by her employer.

The sixth example involves flowers which were sent by appellant's husband and delivered to appellant at the medical office. It appears that the doctor intercepted the arrangement after it was delivered to the office by a courier, removed the card of the husband, and delivered the flowers to the appellant, telling the appellant that the flowers were from the doctor. Again, appellant did not know what motivated the doctor to do this, but she did state that the doctor did this in a joking fashion and that she felt that the conduct was unnecessary and unprofessional. This conduct does not evidence a sexual advance, but was a clumsy attempt at humor.

The seventh example involves the doctor's asking the appellant, while at a 1994 medical exposition where the doctor's practice had a display booth, to be a live model for the audience. The doctor asked her to be the model because the person scheduled to be the live model had not arrived and the doctor was afraid that he would not have a model at the time scheduled for his demonstration. In any event, the regular model did arrive in time so the appellant was not pressed

into service. The appellant found the situation "amusing." In its proper context, the conduct does not evidence a sexual advance toward appellant.

The eighth example involves the doctor's alleged observation that every woman needed breast implants. If this observation was uttered by the doctor, there is no indication that it was directed at the appellant or was meant to be a sexual advance toward her. Given the doctor's chosen medical specialty and his lengthy personal involvement in the field of breast augmentation devices in particular, the observation is an understandable expression of his professional opinion, which conclusion may or may not be generally accepted by others.

The ninth example involves the doctor's comments about women who accompanied him on business trips. Appellant could not recall if the doctor made these observations while other people, in addition to the appellant, were present. Appellant specifically recalled an observation by the doctor after he had returned from a business trip to Europe, sponsored by Dow Corning, in which the doctor told of a female escort who "took care of his every need," and that women, presumably waitresses in the employ of the establishment operating the sauna, would come to the men's sauna to serve them drinks. Appellant found the observations to be "unusual," adding "that's the best you got to tell me about your trip to Europe." These comments, by appellant's own reaction, do not evidence a sexual advance or an abusive work environment.[5] Appellant was not offended at the time by the stories by the reference to interaction with women, but instead was more concerned by the doctor's inability to share details of his trip which she considered to be of more interest.

The tenth example involves the appellant, while at an office Christmas party at a local bar/restaurant, coming downstairs from the restaurant and observing the doctor dancing in the lounge with a woman's slip in his hands. Takach did not know where the slip came from or whose it was. This conduct may be characterized as juvenile and inappropriate for a professional, but there is no indication that the conduct, which Takach had to voluntarily come down to happen upon and see, was directed at the appellant or was intended as a sexual advance toward appellant.

The eleventh example involves a December 1993 after-work dinner at a restaurant located in their office building. Attending this dinner were Dr. Picha, Pat Gilpin (Dr. Picha's office manager), the appellant, Dr. Pelagalli, Dr. Pelagal-

---

5. According to Dr. Picha, the business trips to Europe which were sponsored by Dow Corning usually involved between two to eight Dow Corning personnel, of whom half would be women. Put in its common context, the phrase "take care of my every need" could very easily evidence the fact that the Dow Corning escort(s) assigned to Dr. Picha was/were exemplary travel planner(s) and host(s). The utterance of that phrase, by itself, does not evidence a sexual connotation under the facts of this case.

li's wife, and Tamara (Dr. Pelagalli's office manager). Drinks were served prior to the dinner in the lounge and during dinner. Appellant alleged that Dr. Picha, "for a brief moment," placed his hand on her leg under the dinner table, in a grabbing fashion, above the knee. Dr. Picha's hand did not move up the leg, but stayed briefly near the knee before it was removed by Dr. Picha without anyone saying a word and the dinner continuing. Appellant went home upset, but never mentioned it to the doctor.

The thirteenth example involves a Christmas office party several weeks after the leg-touching-under-the-table incident. This party was a joint party between Dr. Picha's office and Dr. Pelagalli's office and spouses were invited. At this party, while other people were in the room and her husband was in sight talking with Mrs. Picha, appellant was dancing with Dr. Picha. While dancing, appellant claims that Dr. Picha placed his hand up the back of her sweater and attempted to pull the sweater up over her head. In response to this conduct, Takach "pushed him away, grabbed my coat, and said 'in your dreams,' and walked— found my husband and walked out the door. I was very upset by that. * * * I couldn't understand his actions, they were not welcomed." Appellant told no one, not even her husband, about this incident. Takach Deposition, at 154. Also, Takach could not recall Dr. Picha's saying anything at this party of a sexual nature.

■ Appellant makes a limited number of other observations concerning Dr. Picha, which include the following: (1) at an office Christmas party, Dr. Picha having a cake in the form of a female human breast and having Dr. Picha bend down and bite the cake; (2) Dr. Picha telling a female staff member that she looked "really hot today"; (3) Dr. Picha commenting about the post-augmentation surgery of a staff member's breasts, that the surgery made her look sexier; (4) Dr. Picha fanning himself while walking out of a female's examining room, which fanning motion was understood by the staff to mean that the female in the room was considered by Dr. Picha to be very attractive; (5) Dr. Picha allegedly making unwanted sexual advances on a staff worker named Kathryn, which was reported to co-worker Susan Lape, and which hearsay is included in the affidavit of Lape. The common thread in all of these five observations is that none of them was directed at the appellant, if appellant was in the presence of the conduct at the time of the conduct. None of these instances could be interpreted as a sexual advance toward the appellant, since there was no importuning of the appellant for sexual favors either at the time of the conduct or thereafter. Also, the conduct of Dr. Picha herein, while sometimes coarse, in poor taste, and tinged with sexual innuendo, does not rise to the level of the conduct of the supervisor (Mr. Hall) in *Baskerville v. Culligan Internatl. Co.* (C.A.7, 1995), 50 F.3d 428, which conduct was found not to amount to actionable sexual harassment.

We conclude that these instances and conduct do not create a genuine issue of material fact with regard to the *Harris* standard of review and the second, third, and fourth elements necessary for the cause of action.[6]

Accordingly, the second assignment of error is overruled.

### III

"The trial court erred in granting summary judgment with regard to plaintiff's claim of intentional infliction of emotional distress."

 In order to prevail on a claim for intentional infliction of emotional distress, plaintiff must demonstrate the following four elements:

"1. That the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;

"2. That the actor's conduct was so extreme and outrageous as to go 'beyond all possible bounds of decency' and was such that it can be considered as 'utterly intolerable in a civilized community,' Restatement of Torts 2d (1965) 73, Section 46, comment d;

"3. That the actor's actions were the proximate cause of plaintiff's psychic injury; and,

"4. That the mental anguish suffered by plaintiff is serious and of a nature that 'no reasonable man could be expected to endure it,' Restatement of Torts 2d 77, Section 46, comment j." See *Tschantz v. Ferguson* (Cuyahoga 1994), 97 Ohio App.3d 693, 702, 647 N.E.2d 507, 513, quoting *Pyle v. Pyle* (1983), 11 Ohio App.3d 31, 34, 11 OBR 63, 66–67, 463 N.E.2d 98, 103–104; see, also, *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 375, 6 OBR 421, 426–427, 453 N.E.2d 666, 671–672, and *Schwartz v. Comcorp, Inc.* (1993), 91 Ohio App.3d 639, 633 N.E.2d 551.

 The record on appeal demonstrates that appellant sought and received medical treatment and prescription medications for stress and anxiety complaints allegedly caused by the rigors of her employment with Dr. Picha's office in having her duties reassigned and problems and concerns she was experiencing in her home life at the time, including concerns over her husband's health due to his heart condition, concerns over her son's diabetic condition, stress associated with paying for family health care costs and/or obtaining or retaining adequate health care insurance for her family through her employment, and stress associated with her own health due to silicone breast implants allegedly leaking silicone within

---

6. In the case at bar, the first and fifth elements of the cause of action for sexual harassment are not at issue.

her body. See the medical reports of Drs. Ashenberry and Stein. The decision to reassign appellant's job duties, which caused a great deal of concern for appellant that she was being forced out of the medical practice, was based on justifiable business concerns by Dr. Picha. Dr. Picha's decision to initially segregate breast implant patients from appellant's duties in 1992 was premised on the employer's natural concerns of a potential business risk. Having knowledge of appellant's products liability action against Dow Corning in 1992, Dr. Picha was naturally concerned about the potential for appellant to unduly influence his breast patients and the doctor did not want his breast patients' records to be open to the appellant in the event that appellant would be tempted to use information therein to further her action against Dow Corning. Another reason for restricting appellant's duties with the breast patients was because the doctor felt uneasy having an employee handling those duties who may be adverse to his interests, knowing that he had a history of business dealings with Dow Corning and had been retained as a defense expert in the silicone implant class action litigation in general. The reasons given for the continued reassignment of appellant's job duties was based on a rational assessment of the strengths and weaknesses of the staff members, the merging of two plastic surgeons' practices at different locations into a group practice, the desire of the physicians and the office manager to cross-train the staff in different aspects of the group practice so as to form a smoother-functioning practice where the merged staffs are comfortable with all doctors in the group practice, and the desire for the new surgeon (Dr. Gerding) to work with a particular nurse (Laura Widmer). While appellant naturally felt a great deal of angst over these reassignments and did not relish the thought that she would no longer be working as closely as she would have liked with particular patients or Dr. Picha, there is no indication that the reassignment of duties was done as a punishment for not having acceded to sexual demands of Dr. Picha. The conduct of which appellant complains, as detailed in the previous assignment, does not satisfy the first and second elements, and possibly the third element, of the *Tschantz* standard. Accordingly, the trial court did not err in granting summary judgment on this cause of action.

The third assignment of error is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

O'DONNELL, P.J., and PATTON, J., concur.