OPINION
{¶ 1} Plaintiff-appellant/cross-appellee Ann C. Dater challenges the trial court's dismissal of her claims against defendant-appellee/cross-appellant the Charles H. Dater Foundation, Inc. In a cross-appeal, the Foundation takes issue with the trial court's denial of its motion for summary judgment. For the following reasons, we hold that the Foundation was not entitled to summary judgment, and we reverse the trial court's dismissal of the case and remand the cause for further proceedings.
 I. Facts {¶ 2} The late Charles H. Dater was a successful businessman who had acquired great wealth during his lifetime. By 1985, Mr. Dater's personal net worth was over $25 million. Over a period of years, Mr. Dater had placed many of his assets in the custody of the investment firm Merrill Lynch through a broker named Alan Ziegler. Sometime in the early 1980s, Ziegler retired and Mr. Dater's account with Merrill Lynch was taken over by Daniel L. Olberding. Olberding was in a partnership relationship with two other Merrill Lynch brokers, Stanley Frank, Jr., and John Silvati, in which they agreed to share commissions and business opportunities.
 {¶ 3} In August 1985, Mr. Dater suffered a stroke and was unable to manage his financial affairs. Shortly thereafter, Olberding referred Mr. Dater to the law firm of Eichel Krone. In November 1985, Charles Dater's estate plans, which had been in place with the Central Trust Company since 1940, were modified by the creation of the Charles H. Dater Foundation, Inc., an Ohio charitable trust. At the Foundation's inception, Paul W. Krone, Paul's son, Bruce A. Krone, David L. Oberding, Stanley J. Frank, Jr., and John D. Silvati were named as Foundation trustees.[1]
 {¶ 4} Approximately one month later, Mr. Dater executed a new agreement that created the Charles H. Dater Trust. On January 5, 1990, despite evidence that Mr. Dater was suffering from dementia and Alzheimer's disease and that his mental condition was deteriorating, Mr. Dater executed the Charles H. Dater Last Will and Testament and bequeathed the residue of his estate under a pour-over provision to the Dater Trust, an existing inter vivos trust. On that same day, Mr. Dater also executed a document called the Second Amendment and Restatement of Trust Agreement, which amended the terms of the Dater Trust.
 {¶ 5} Mr. Dater died on September 23, 1993. He was survived by his wife, Ann Dater. Pursuant to the estate plans, the Dater Trust provided that, upon Mr. Dater's death, Paul W. Krone, Bruce A. Krone, David L. Olberding, Stanley J. Frank, Jr., and John D. Silvati would become trustees of the Dater Trust. The trust further provided that if one of these trustees died or stepped down, he would be succeeded by his wife and then children in descending order of age.[2] The Dater Trust also contained a provision calling for the Foundation to receive assets upon Mr. Dater's death. The Dater Trust divided the corpus into shares, one of which was paid outright to the Foundation, with the remaining shares to be held in trust for Mrs. Dater and her children, and with the bulk of the remainder thereof to be paid over to the Foundation. At the time of Mr. Dater's death, the Dater inter vivos trust was a fully funded trust with assets over $50 million.
A. Events Precipitating the First Appeal
 {¶ 6} In September 1997, Ann Dater, her child, and her grandchildren ("Plaintiffs") filed a complaint against Bruce A. Krone, Dorothy G. Krone,[3] David L. Oberding, Stanley Frank, Jr., and John D. Silvati, in their capacities both as individuals and as trustees of the Charles H. Dater Second Amendment and Restatement of Trust Agreement ("Dater trustees"), the law firm of Eichel Krone, Co., L.P.A., the Dater Foundation, and the Ohio Attorney General.[4] The Plaintiffs, asserting claims for fraud, breach of fiduciary duty, professional negligence, tortious interference, and unjust enrichment, sought, among other things, to have the second amendment to the Dater trust agreement declared invalid.
 {¶ 7} In June and July of 1998, the trial court issued findings of fact and conclusions of law dismissing the Plaintiffs' claims against the Foundation entirely. In August 1998, the trial court ratified its June 1998 legal conclusion in its amended findings of fact and conclusions of law. In 1999, the Plaintiffs entered into a confidential settlement agreement with all of the defendants except the Foundation. On December 6, 1999, the trial court amended its July 1998 entry dismissing the Foundation to include a Civ.R. 54(B) certification. On December 7, 1999, the trial court issued an order of dismissal, stating that "[u]pon application and for good cause shown, all claims against all Defendants in this action, except for the Charles H. Dater Foundation, are hereby dismissed with prejudice." The plaintiffs appealed the trial court's dismissal of their complaint.
 B. The First Appeal
 {¶ 8} On December 1, 2000, we reversed the trial court's dismissal of the Plaintiffs' claims against the Foundation.[5] We held that because the trial court had sua sponte reviewed documents in Charles H. Dater's probate file and had used that information as the basis for its dismissal of the Plaintiffs' complaint, it had converted the Foundation's motion to dismiss into one for summary judgment. Because "the trial court [had given] no notice to the parties of the conversion and [had] not provide[d] them with the opportunity to present documentary evidence for the court to consider in determining whether triable issues existed under Civ.R. 56," we concluded that the trial court had erred in granting the Foundation's motion to dismiss. We further held that because the Dater Trust, which had funded the Foundation, was a valid inter vivos trust, the trial court had erred in applying the Ohio Supreme Court's decision in Hageman v. The Cleveland Trust,[6] which concerned an invalid inter vivos trust, to conclude that the Plaintiffs' failure to contest the Dater will in probate court had precluded them from proceeding with their claims against the Foundation. Moreover, we concluded that the trial court had abused its discretion in denying the Plaintiffs' motion for leave to amend their complaint. Consequently, we reversed the trial court's entry granting the Foundation's motion to dismiss and remanded the cause for further proceedings.
C. Events Precipitating the Second Appeal
 {¶ 9} On March 26, 2001, Ann Dater filed an amended complaint against the Foundation, in which she asserted claims of lack of capacity, unjust enrichment, constructive trust, and conversion.[7] The thrust of the complaint was that, from the time of the Foundation's incorporation, one or more of its trustees had "actively engaged in a scheme to take advantage of [Mr. Dater's] incapacity and to have monies transferred from Mr. Dater's trust to the Dater Foundation so that the greater the Foundation's assets, the greater would be the trustee and professional fees paid themselves." The complaint sought the return of approximately $27 million to the Charles H. Dater Trust.
a. The Foundation's Motion for a Protective Order
 {¶ 10} On July 19, 2001, Assistant Attorney General Monica A. Moloney deposed Foundation Trustee Bruce A. Krone. During the course of the deposition, the assistant attorney general, as well as Mrs. Dater's counsel, sought to inquire into matters relating to the administration and operation of the Foundation after Mr. Dater's death in September 1993. Krone's personal counsel, as well as counsel for the Foundation, objected to the relevance of such questioning on the basis that discovery concerning matters after Mr. Dater's death was not relevant to any of the claims in the amended complaint. As a result, counsel for the Dater Foundation invoked the provisions of Civ.R. 30(D) and adjourned the deposition in order to present the dispute to the trial court.
 {¶ 11} On August 31, 2001, the Foundation moved for a protective order under Civ.R. 30(D) and 26(C). The Foundation argued that inquiry into matters related to the Foundation's administration after Mr. Dater's death was not reasonably calculated to lead to the discovery of admissible evidence, but only served to harass, embarrass, and oppress the Foundation and its trustees. Mrs. Dater filed a memorandum opposing the protective order along with a motion to compel the completion of Bruce Krone's deposition. The Ohio Attorney General also filed a memorandum opposing the protective order. On September 18, 2001, the trial court held a hearing on the Foundation's motion. On September 27, 2001, the trial court granted the Foundation's motion for a protective order and denied Mrs. Dater's motion to compel the completion of Bruce Krone's deposition.
b. The Foundation's Motion for Summary Judgment
 {¶ 12} On December 4, 2001, the Foundation filed a motion for summary judgment. Both the Ohio Attorney General and Mrs. Dater filed a memorandum opposing the Foundation's motion for summary judgment. The Foundation filed replies to both opposing memoranda. On February 6, 2002, Mrs. Dater filed a motion to reconsider and rescind the protective order, against which the Foundation filed a opposing memorandum, and Mrs. Dater filed a reply. On February 22, 2002, the trial court heard oral argument on the Foundation's motion for summary judgment, as well as on Mrs. Dater's motion to reconsider the protective order. On March 5, 2002, the trial court denied the Foundation's motion for summary judgment and overruled Mrs. Dater's motion to reconsider the protective order.
3. Trial Court's Dismissal of Dater's Complaint
 {¶ 13} After filing its motion for summary judgment, the Foundation provided notice for Mrs. Dater's deposition on December 11, 2002, and scheduled the deposition for January 6, 2002, in Cincinnati, Ohio. On January 4, 2002, the Foundation's counsel requested from Mrs. Dater's counsel "a current medical report from a currently-treating physician stating that [Mrs. Dater] could not travel." On January 11, 2002, Mrs. Dater submitted to counsel for the Foundation a letter from Dr. Hayle T. Alden in Arizona indicating his opinion that Mrs. Dater's medical condition prevented her from traveling or being deposed. Mrs. Dater had apparently moved to Prescott, Arizona, sometime in 1998, after the trial court had dismissed most of the claims in the original complaint, to seek medical treatment. After reviewing Dr. Alden's letter, the Foundation's counsel in a letter dated January 22, 2002, informed Mrs. Dater's counsel that Dr. Alden's letter was insufficient because it stated only that Mrs. Dater was unavailable to be deposed and it failed to disclose her medical condition.
 {¶ 14} In response to the Foundation's letter, Mrs. Dater's counsel offered to produce to the court in camera another report from a licensed medical doctor, to detail Dater's medical condition and to explain why the condition prevented her from traveling to Cincinnati to be deposed. Mrs. Dater's counsel also suggested that one potential compromise might be that Mrs. Dater could pay the expenses of the Foundation's counsel to travel to Arizona to conduct her deposition there.
 {¶ 15} At the February 22, 2002, hearing, the Foundation raised the issue of Mrs. Dater's deposition, following oral argument on its motion for summary judgment. The trial court, after hearing from both parties, stated that if the parties could not mutually resolve the location of Mrs. Dater's deposition, it would occur in Hamilton County, Ohio, unless Mrs. Dater could produce a report from a treating physician disclosing Mrs. Dater's medical condition and stating why her condition prevented her from being deposed in or from traveling to Cincinnati.
 {¶ 16} On February 26, 2002, the Foundation provided notice for Mrs. Dater's deposition on March 11, 2002, in Cincinnati. On March 5, 2002, the trial court issued an order that reiterated its statements from the February 22 hearing.
 {¶ 17} On March 7, 2002, Mrs. Dater's counsel faxed a letter to counsel for the Foundation from Dr. Murray R. Susser, a licensed physician board-certified in family practice, who had examined Mrs. Dater on March 5, 2002, in Los Angeles, California. Dr. Susser opined that Mrs. Dater's ability to travel to Cincinnati for her deposition was precluded by her medical condition. Mrs. Dater's counsel thus informed the Foundation's counsel that she was not going to attend the March 11, 2002, deposition.
 {¶ 18} The parties raised the issue of Mrs. Dater's deposition at a pretrial conference on March 13, 2002, and Dr. Susser's letter was presented to the trial court for in camera inspection. In his letter, Dr. Susser disclosed Mrs. Dater's age, 85, and her medical conditions. He then stated the following:
 {¶ 19} "When Mrs. Dater presented herself to me, I understood that she had recently traveled by charter plane from Prescott, Arizona, to Santa Monica, California for the purpose of receiving medical treatment at my office. It is clear that in her current condition, even this shortest episode of travel was beyond her tolerance.
 {¶ 20} "It is my medical opinion that Mrs. Dater cannot participate in commercial air travel, especially in view of the rigors of requiring to [sic] check-in early, the risk of flight delays, and other common stresses. This leaves as the only other possibility that Mrs. Dater charter a flight to Cincinnati.
 {¶ 21} "It is my medical opinion that traveling such a long distance even by charter flight is contraindicated by her medical condition. It is my belief that for her to undergo such a stressful event would lead to serious risk.
 {¶ 22} "To combine such a travel agenda with what I understand may be a requirement that she sit and give testimony for as long as a day, my medical opinion is even stronger that she could not withstand such strain and such events could result in severe exacerbation to her condition.
 {¶ 23} "Based upon the foregoing, it is my view that to require Mrs. Dater to travel to Cincinnati in her current condition would be an act of cruelty and should be avoided. Under controlled conditions, Mrs. Dater is able to give testimony, but is [sic] should be in conditions which provide for her greatest possible comfort and the least stress. * * *"
 {¶ 24} On April 8, 2002, the trial court, without explanation, ordered Mrs. Dater to appear for her deposition in Cincinnati at a time to be reasonably agreed upon by the parties by June 30, 2002. The trial court further stated that it would impose sanctions if Mrs. Dater failed to appear.
 {¶ 25} On May 6, 2002, the Foundation served Mrs. Dater's counsel with another notice of deposition to take place in Cincinnati on June 5, 2002. On June 3, 2002, Mrs. Dater's counsel sent a letter to the Foundation's counsel. The letter stated that Mrs. Dater would not be appearing for her deposition because "she d[id] not believe she [could] tolerate such travel in her condition," but that "she remain[ed] willing to be deposed in her current location [in California]."
 {¶ 26} On July 16, 2002, the Dater Foundation filed a motion for sanctions against Mrs. Dater. In its motion, the Foundation requested that the trial court sanction Mrs. Dater either by precluding her from presenting any witnesses in her case-in-chief or by excluding Mrs. Dater's trial testimony and any witnesses whom she had identified in her case-in-chief whose testimony would be based on communications with her. The Foundation also asked that it be awarded its costs and attorney fees associated with the motion. On July 29, 2002, Mrs. Dater filed a memorandum opposing the Foundation's motion for sanctions. In the memorandum, Mrs. Dater argued that she had complied with the trial court's March 5, 2002, order to provide a report from a licensed medical doctor disclosing the nature of her medical condition and expressing an opinion that her medical condition prohibited her from traveling to Cincinnati. She further contended that the Foundation was hard-pressed to articulate any hardship it might suffer by traveling to California to take her deposition, given her offer to pay for the cost and time of travel incurred by the Foundation's counsel in conducting her deposition in California.
 {¶ 27} On August 26, 2002, the trial court issued an opinion and order, in which it stated, that because "Mrs. Dater [had] initiated the litigation in Hamilton County, her deposition would have to take place in Hamilton County, unless it was medically impossible that her deposition could occur in this venue." The court went on to state that Mrs. Dater had presented it with "a letter from a `holistic doctor' suggesting that [her] health conditions prevented her from traveling outside of her locale to be deposed," and that the "[c]ourt along with the attorneys for both sides, had some questions regarding the conclusion of this physician, [so] a second medical opinion was requested."[8] The court then stated that Mrs. Dater "instead of seeking a second medical opinion from a physician in Prescott, Arizona, traveled by some unknown means of conveyance, possibly a chartered airplane, to Santa Monica, California to secure a more definitive medical opinion to suggest that her health conditions prevented her from traveling to a deposition in Ohio. The irony of this conclusion, judging from the fact that the plaintiff had no problem traveling to secure a medical opinion, was lost on neither this Court nor the attorneys representing the defendants."
 {¶ 28} In sum, the trial court found "that plaintiff was ordered to appear in Cincinnati, Ohio[,] for the purpose of being deposed by the defendants, that plaintiff failed to appear for said deposition on more than one occasion, and plaintiff, by and through her trial counsel, has never requested this court to quash the Notice of Deposition, to stay the deposition, or to seek any protective order pursuant to Rule 26(C) of the Ohio Rules of Civil Procedure."
 {¶ 29} The trial court concluded that dismissal was the appropriate sanction, given Mrs. Dater's willful failure to be deposed in Ohio. "This Court, mindful of plaintiff's voluntarily [sic] travel from Arizona to California to secure a medical opinion that she is too ill to travel, must rightfully conclude her failure to travel to Ohio for deposition is a willful act and in direct violation of this Court's order."
 {¶ 30} The court further stated that Mrs. Dater would have the opportunity to purge herself "of contempt and possible dismissal of this action with prejudice by appearing in Cincinnati, Ohio on or before September 13, 2002, for her deposition and avail[ing] herself for such period of time until all parties have had the ample opportunity to depose her." The court concluded by stating that if Mrs. Dater failed to begin her deposition on or before September 13, 2002, her complaint would be dismissed with prejudice.
 {¶ 31} On September 13, 2002, a conference call occurred between the parties and the trial court, during which Mrs. Dater's counsel informed the court that Mrs. Dater would not be appearing for her deposition by the court-imposed deadline. Mrs. Dater's counsel further asked the court to reconsider its decision to dismiss the case with prejudice. That same day, Mrs. Dater's counsel faxed a motion to the trial court requesting that the court reconsider its order of August 26, 2002, or, alternatively, extend the deadline for deposing Mrs. Dater and continue the trial. The motion was filed on September 16, 2002. Attached to the motion was an affidavit from Mrs. Dater's counsel, averring that Mrs. Dater had remained in California since March 2002, that she had been admitted to an in-patient hospital facility no fewer than three times during the past three months, and that she was currently admitted at Cedars-Sinai Hospital in California, where she had been a patient for approximately ten days. Thus, Mrs. Dater's counsel argued she was unable, rather than unwilling, to comply with the court's order to travel to Cincinnati by the court-imposed deadline.
 {¶ 32} On September 18, 2002, the Foundation filed a memorandum opposing Dater's motion to reconsider, and Dater filed a reply on September 19, 2002. On September 20, 2002, the trial court journalized a lengthy entry denying Dater's motion to reconsider. In its entry, the trial court, responding to what it termed "the embarrassing memorandum Mrs. Dater's counsel had indicated he would file at the September 13, 2002, telephone conference," vigorously defended its impartiality in handling Mrs. Dater's claims.[9] After responding to the claimed attack, the court chastised Mrs. Dater's counsel for misrepresenting Mrs. Dater's financial situation to the court. The court then concluded with the following remarks:
 {¶ 33} "As most judges, I do take personal pride in how I handle all cases assigned to myself, the legal reasoning and precedents cited, and my attempt to resolve all cases in a just and impartial manner. This Court's position has always been one of consistency pertaining to defendants' attempt to depose plaintiff, i.e. said deposition will take place in Hamilton County, Ohio. At no time between April 1, 2001, and today has plaintiff ever sought a protective order seeking to quash a deposition date(s) for plaintiff. Additionally, Mr. Lindsmith (Mrs. Dater's counsel) contacting the Court at quite literally the eleventh hour, i.e. 2:30 p.m. on the last day for plaintiff to begin her deposition in Cincinnati, and finally in his motion of September 16, 2002, requesting the Court to continue the trial court date of October 25, 2002 to a date uncertain, should be considered a text book definition of `chutzpah.' The only observation I can make regarding when plaintiff will be available to be deposed is that it will occur on the "Twelfth of Never," and that is a long, long time, with all due respect to Johnny Mathis. * * * For the reasons stated in this decision, plaintiff's motion of September 16, 2002 is denied in its entirety."
 {¶ 34} In an October 3, 2002, entry, the trial court incorporated its August 26, 2002, order and its September 20, 2002, order by reference and dismissed Mrs. Dater's complaint with prejudice. On October 24, 2002, Mrs. Dater filed a notice of appeal. On November 1, 2002, the Dater Foundation filed a notice of cross-appeal.
 II. Mrs. Dater's Appeal A. Dismissal of the Complaint was an Abuse of Discretion
 {¶ 35} In her appeal, Mrs. Dater raises two assignments of error for our review. In the first assignment of error, Mrs. Dater contends the trial court abused its discretion when it dismissed her complaint based on her failure to appear in Cincinnati for her deposition. We agree.
 {¶ 36} Civ.R. 37 governs matters concerning the failure to provide discovery and the available sanctions a trial court may impose. Civ.R. 37(D) provides that a party failing to appear for a deposition is subject to sanction by the trial court, as authorized under subsections (a), (b) and (c) of Civ.R. 37(B)(2). Civ.R. 37(B)(2)(c) provides, in pertinent part:
 {¶ 37} "If any party * * * fails to obey an order to provide or permit discovery * * * the court in which the action is pending may make such orders in regard to the failure as are just, and among others [may] * * * dismiss the action or proceeding or any part thereof * * *."
 {¶ 38} The Ohio Supreme Court has held that "judicial discretion must be carefully — and cautiously — exercised before [it] will uphold an outright dismissal of a case on purely procedural grounds."[10] Accordingly, the court has applied a heightened abuse-of-discretion standard when reviewing dismissals under Civ.R. 37(B)(2)(c).[11] Under this heightened standard, a trial court abuses its discretion when it dismisses a case under Civ.R. 37(B)(2)(c) on a record that fails to demonstrate willfulness or bad faith by the sanctioned party.[12]
 {¶ 39} The Ohio Supreme Court has held that when a party cites valid health reasons as an excuse for not responding to discovery requests, the health reasons serve as mitigating factors and show that the party has not willfully or in bad faith failed to respond to the discovery requests.[13] This court has also implied that illness is a valid excuse for a failure to comply with discovery orders, when in Evansv. Smith, we stated that if the record failed to "show that the failure to comply with discovery orders was due to inability, such as illness, rather than willfulness, bad faith, or any other fault of the noncomplying party," then dismissal of an action pursuant to Civ.R. 37 was not an abuse of discretion.[14]
 {¶ 40} Other Ohio appellate courts have likewise held that it is inappropriate for a trial court to order dismissal or default against a party when the party has produced evidence demonstrating that the inability to comply with a discovery order was due to health problems. For example, in Barbato v. Miller,[15] the Eighth Appellate District held that the trial court abused its discretion when it entered a judgment for failure to appear at trial against an 89-year-old defendant who was in failing health. The defendant had produced a letter from her attending physician stating his medical opinion that it would be detrimental to the defendant's medical condition to go through the stress and tension associated with any litigation. The appellate court concluded that "[w]hen a party is in ill health, the probability of severe physical injury or death resulting from appearing at trial is an `undue burden,'" and on that basis, reversed the trial court's denial of the defendant's motion to quash a subpoena ordering her to appear at trial.[16]
 {¶ 41} In its March 5, 2002, entry the trial court ordered Mrs. Dater to be deposed in Cincinnati unless she produced a report from a licensed medical doctor expressing an opinion that her medical condition prohibited her from traveling to Cincinnati. On March 13, 2002, Mrs. Dater, in compliance with the trial court's March 5, 2002, order, provided the court with a letter from her treating physician, Dr. Murray R. Susser. In his letter, Dr. Susser unequivocally stated that Mrs. Dater's medical condition prohibited her from traveling to Cincinnati to be deposed.
 {¶ 42} On April 8, 2002, the trial court, after reviewing Dr. Susser's letter, issued a new order in which it stated that Mrs. Dater had to be deposed in Cincinnati. When Mrs. Dater failed to appear for her May deposition, the Foundation moved for sanctions in July. In its August entry, the trial court stated that it would dismiss Mrs. Dater's claims if she failed to appear for a deposition by September 13, 2002. The trial court's dismissal was predicated on Mrs. Dater's bad faith and/or willful failure to appear for her deposition. The trial court's finding of bad faith and willfulness was evidently premised on Mrs. Dater's travel by private plane from Prescott, Arizona, to Los Angeles, California, which the trial court viewed as an attempt "to secure a medical opinion that she was too ill to travel." Yet, there is nothing in the record to support this finding.
 {¶ 43} The only evidence in the record related to why Mrs. Dater flew to California is Dr. Susser's affidavit. In his affidavit, Dr. Susser stated that Mrs. Dater had traveled to California not to seek another medical opinion, but to seek further medical treatment for an existing illness. Furthermore, the trial court had before it evidence that Mrs. Dater, following her trip to California, had remained there seeking medical treatment for her existing illness. Mrs. Dater's counsel had averred that Mrs. Dater was unable to comply with the court's deadline due to the fact that she was currently hospitalized and had been hospitalized no fewer than three times for her existing illness.
 {¶ 44} Under Toney v. Berkemer and its progeny, the health reasons provided by Mrs. Dater served as mitigating factors and showed that she did not willfully or in bad faith fail to comply with the trial court's order. Because the Foundation never proffered any evidence to contradict the medical opinions of Dr. Alden or Dr. Susser or to contradict Mrs. Dater's evidence that she was unable to travel, the trial court's disregard of these physicians' opinions, with no contrary evidence, was unreasonable and an abuse of its discretion. Because we hold that the record fails to support the trial court's finding that Mrs. Dater's failure to comply with its discovery order was willful or in bad faith, we hold the trial court abused its discretion when it dismissed Mrs. Dater's claims.
 {¶ 45} Furthermore, we hold that the trial court also abused its discretion when it failed to consider less severe sanctions or alternatives to dismissal. This court has held that "it is the policy in Ohio to impose the least severe sanction or a sanction less severe than that of dismissal of the action with prejudice, unless the conduct of the plaintiff is so negligent, irresponsible, contumacious or dilatory as to outweigh the policy that disposition of litigation should be upon its merits."[17] Had the trial court considered other alternatives, it could have accommodated all the parties and still enabled Mrs. Dater to present her case on the merits. For example, Mrs. Dater in January 2002 had proposed to the Foundation's counsel that she pay the expenses of the Foundation's counsel to travel to Arizona to conduct her deposition. Mrs. Dater proposed this to the trial court in February 2002 and thereafter, yet the trial court never once entertained Mrs. Dater's offer to be deposed in her current location and to pay the cost of opposing counsel to attend the deposition. Nor did the trial court explain why such an offer was inappropriate. Mrs. Dater also proposed that her deposition be taken by telephone as provided under Civ.R. 30(b)(6) or by written question as provided under Civ.R. 31. Yet the trial court never considered these alternatives. Under any of these circumstances, the Foundation could have deposed Mrs. Dater while still remaining considerate of her inability to travel to Cincinnati.
 {¶ 46} Although we understand why the Foundation might have wanted to take Mrs. Dater's deposition in Cincinnati, neither the trial court nor the Foundation has cited any legal authority for their argument that, because Mrs. Dater had filed suit in Cincinnati (albeit seven years earlier), her deposition had to occur in Cincinnati as well. Given today's technology and the fact that alternative sanctions were available, the trial court's unyielding position on the location of Mrs. Dater's deposition was unreasonable and an abuse of discretion.
 {¶ 47} Consequently, we hold the trial court abused its discretion when it found that Mrs. Dater's failure to appear in Cincinnati for her deposition merited dismissal of her action with prejudice. We, therefore, sustain Mrs. Dater's first assignment of error.
B. Granting the Protective Order and Denying the Motion to Compel wasan Abuse of Discretion
 {¶ 48} In the second assignment of error, Mrs. Dater argues the trial court erred in granting the Foundation's motion for a protective order and in denying her motion to compel the completion of Foundation trustee Bruce Krone's deposition.
 {¶ 49} The Foundation had moved for a protective order pursuant to Civ.R. 26(C) and Civ.R. 30(D) during Bruce Krone's deposition to prevent Mrs. Dater and the Ohio Attorney General from inquiring into any matters related to the Foundation's administration subsequent to Charles Dater's death. The trial court issued the order, finding any inquiry into the Foundation's administration after Mr. Dater's death was irrelevant because Mrs. Dater had limited the issues in her amended complaint to the question of whether Mr. Dater had the capacity to make certain asset transfers to the Foundation during his lifetime, and because she had voluntarily dismissed with prejudice all her claims against the trustees.
 {¶ 50} The Ohio Supreme Court has held that the decision to grant or deny a protective order is within a trial court's discretion and will not be reversed absent an abuse of discretion.[18] Under this standard, a trial court abuses its discretion when its attitude is unreasonable, arbitrary or unconscionable.[19] The Ohio Supreme Court, noting that an abuse of discretion usually involves decisions that are unreasonable rather than arbitrary or unconscionable, has defined "unreasonable" as having "no sound reasoning process that would support that decision."[20]
 {¶ 51} Civ.R. 26(B)(1) provides that parties "may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of any other party." Ohio courts have held that the relevancy test under Civ.R. 26(B)(1) is much broader than the test for relevancy utilized at trial.[21] Consequently, matters are only irrelevant at the discovery stage when the information sought will not lead to the discovery of admissible evidence.[22] Moreover, "the concept of relevancy as it applies to discovery is not to limit it to the issues in the case, but to the subject matter of the action, which is a broader concept."[23]
 {¶ 52} Mrs. Dater argues that the trial court abused its discretion in granting the Foundation's motion for a protective order, because the allegations in her amended complaint put at issue the conduct of the Foundation trustees both before and after Mr. Dater's death, and because evidence of the trustees' post-death profits were relevant to explaining their motive for engaging in such wrongful conduct. We agree.
 {¶ 53} In her amended complaint, Mrs. Dater had alleged that the trustees of the Foundation had wrongfully transferred assets from the Dater family trust to the Foundation, and that these transfers were part of a larger scheme undertaken by the trustees to take advantage of Mr. Dater for their own personal benefit. For example, Mrs. Dater alleged the following:
 {¶ 54} "That the Foundation by and through its trustees had engaged in a scheme to take advantage of Mr. Dater while he was incapacitated to have him transfer funds from the Dater family trust to the Foundation so that the trustees' fees would be enlarged by the increased value of the Foundation.
 {¶ 55} "That David L. Olberding, acting as a trustee of the Foundation, submitted to Mr. Dater, while he was incapacitated, pre-prepared form letters, authorizing transfers of funds from the Dater family trust to the Foundation, including one transfer of 50,000 shares of Proctor Gamble stock valued at $5 million,
 {¶ 56} "That David Olberding, Stanley J. Frank, and John D. Silvati, acting as trustees for the Foundation, self-generated $1.8 million in commissions as a result of these pre-prepared form letter transfers from the Dater family trust to the Foundation, [and]
 {¶ 57} "That Olberding, acting as a trustee of the Foundation, had Mr. Dater sign life and annuity contracts while he was incapacitated whereby the premiums for these contracts were paid out of the Dater family trust, but the benefits accrued to the Foundation, including one such annuity purchase less than one month before Mr. Dater's death, and that, upon Mr. Dater's death, the Foundation received $5 million from these contracts."
 {¶ 58} Evid.R. 404(B) provides that evidence of other crimes, wrongs, or acts is admissible as "proof of motive, opportunity, intent, preparation, [or] plan." Here, post-death profits by the Foundation and its trustees would have been relevant to whether the trustees had engaged in a scheme to take advantage of Mr. Dater during his lifetime.[24]
 {¶ 59} Moreover, the fact that Mrs. Dater had previously settled her claims against the trustees did not foreclose her from conducting discovery regarding the Foundation's operations after Mr. Dater's death. The Foundation could only act through its trustees.[25] So without the ability to discover any evidence of the trustees' actions after her husband's death, Mrs. Dater would have been unable to demonstrate the extent to which the Foundation and the individual trustees had been benefited.
 {¶ 60} Because the trial court was under the erroneous impression that Mrs. Dater's settlement with the trustees in their individual capacities and as trustees of the Dater Trust precluded her from obtaining any discovery as to their conduct, and because evidence of the trustees conduct after Mr. Dater's death could have led to the discovery of evidence relevant to the motive for and existence of the Foundation's scheme to take advantage of Mr. Dater, the trial court abused its discretion in granting the protective order. As a result, we sustain the second assignment of error and overturn the trial court's order granting the Foundation's motion for a protective order and denying Mrs. Dater's motion to compel the completion of Bruce Krone's deposition.
 III. Dater Foundation's Cross-Appeal {¶ 61} In its cross-appeal, the Dater Foundation advances a single assignment of error, in which it maintains that the trial court erred in denying its motion for summary judgment. The Foundation presents seven issues for our review. The first five issues pertain to the confidential settlement agreement that Mrs. Dater and the other plaintiffs had entered into with all the defendants except the Foundation.[26] The remaining two issues challenge Mrs. Dater's standing to assert her claims against the Foundation.
 {¶ 62} Before addressing the merits of these issues, we note our standard of review. Summary judgment is proper when, upon consideration of all the evidence, (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence, construed most strongly in favor of the nonmoving party, that reasonable minds can only conclude in favor of the moving party.[27] Appellate review of a ruling on a motion for summary judgment is de novo.[28] Accordingly, we stand in the shoes of the trial court and conduct an independent review of the record.[29]
 a. Mrs. Dater Did Not Release the Foundation from Liability
 {¶ 63} In the first issue for review, the Foundation claims that it was entitled to summary judgment on Mrs. Dater's claims for conversion, constructive trust, and unjust enrichment because those claims were based on the alleged tortious behavior of its trustees, whom Mrs. Dater had released from liability. The Foundation contends that Mrs. Dater was foreclosed from recovering additional damages from the Foundation, a party whose liability was secondary and vicarious, and thus dependent upon the liability of the released parties because the alleged liability of the Foundation was not based on its own conduct, but on the purported conduct of its agents, the Foundation's trustees, who had, consistent with the settlement agreement, already been dismissed with prejudice. To support its argument, the Foundation relies upon a line of decisions, including this court's decision in Radcliffe v. Mercy Hospital.[30] We disagree for the following reasons.
 {¶ 64} First, our review of the Settlement Agreement and Release of All Claims, which was entered into among all the litigants except the Foundation, makes clear that no release was provided to the individual defendants in their capacities as trustees of the Foundation. The settlement agreement expressly stated that it was entered into by and among "Stanley J. Frank, Jr., Bruce A Krone, Dorothy E. Krone, David L. Olberding, and John D. Silvati, all of whom are residents of Hamilton County, Ohio (sometimes collectively referred to as the Trustees),individually and in their capacities as trustees of the Charles H. DaterTrust * * * and Bruce Krone in his separate capacity as trustee of the HFC Trust."
 {¶ 65} The third paragraph of the settlement agreement also expressly provided,
 {¶ 66} "Whereas, the Plaintiff, the Trustees, individually, as Trustees of the Charles H. Dater Trust, * * * agree that it is in their mutual best interests to resolve these cases without further litigation or proceedings except that Plaintiffs wish to preserve any claims they and the CHD Trust may have against the Foundation which is not a party to this Agreement * * *."
 {¶ 67} Section 2 of the settlement agreement, which governed the scope of the releases granted to the individual defendants, stated in relevant part,
"Plaintiffs * * * hereby completely release and discharge each and every and all the Defendants individually, as Trustee of the CHD and HFC Trusts, as attorney, accountant, broker, investment advisor, or representative and all of the Defendants' predecessors, * * * and any other person and/or entities which have performed services for the CHD Trust, HFC Trust, successors, and assigns, from any and all claims, causes of action, demands, liability, charges, lawsuits, actions, contests, and/or entitlement, now existing or existing in the future, whether known or unknown, of any nature or kind, whether legal or equitable, whether matured or unmatured, whether arising in the past, present, or future which any or all of the Plaintiffs * * * have, may have, or may have had against each and every and all of the Defendants, including, but not limited to, the administration of the CHD Trust, the administration of the HFC Trust, the Lawsuit and the Replevin Action."
 {¶ 68} Pointedly, nowhere in the settlement agreement was any party released in their capacity as a trustee of the Charles H. Dater Foundation. The parties expressly understood this under Section 3 of the settlement agreement, the covenant not to sue, which provided,
 {¶ 69} "While Plaintiffs do not believe that they have any legal standing whatsoever to bring a claim against SJF, BAK, DEK, DLO, or JDS in their respective capacities as trustees or officers of the Foundation, Plaintiffs and the Successor Trustee nevertheless agree and covenant that they shall not at any time assert any claim * * * against SJF, BAK, DEK, DLO, JDS, PWK, or PWK's estate in any capacity, including as trustees or officers of the Foundation as attorney (including EK), accountant, broker, investment advisor, or representative of or for the Foundation.
 {¶ 70} "The parties to this Agreement hereby agree and acknowledge that this Covenant Not to Sue is only directed to the foregoing persons and entities named in this Section in any capacity and is not intended to apply in any manner whatsoever to the Foundation, itself, against which Plaintiffs, individually or on behalf of the CHD Trust, remain free to assert any claims or causes of action that may exist at law or in equity."
 {¶ 71} This covenant not to sue demonstrated that no party had contemplated any release of the Foundation and that the release did not extend to the individual defendants in their capacities as trustees of the Foundation. Were we to interpret the agreement otherwise, the covenant not to sue would have been superfluous.
 {¶ 72} We likewise reject the Foundation's argument concerning the effect of the settlement agreement on the Foundation's liability. Because Mrs. Dater did not assert a claim of vicarious liability against the Foundation, but instead alleged direct liability on the part of the Foundation itself, the cases cited by the Foundation are inapposite.
 {¶ 73} R.C. 1702.12(A) permits a direct suit against a not-for-profit corporation. Ohio courts have held that where a tort is committed in accordance with the express orders of corporate officers or agents (including trustees) carrying out corporate policy, the corporation is a joint tortfeasor, and is therefore equally liable along with the corporate officer that ordered the wrongful conduct.[31]
 {¶ 74} In her complaint, Mrs. Dater alleged that the trustees of the Foundation had committed the allegedly wrongful actions in order to benefit the Foundation and to carry out the Foundation's policies. For example, Mrs. Dater alleged that Foundation Trustee David Olberding had prepared form letters for a demented Charles Dater to sign, thus authorizing the transfer of funds from the Dater Trust to the Foundation with the benefit of over $8.5 million in such transfers going to the Foundation. Mrs. Dater also alleged that Olberding had Mr. Dater sign $5 million in annuities contracts, with the cost of the annuity being paid by the Dater Trust, but the benefit from the annuities flowing to the Foundation. These allegations place the liability of the Foundation itself directly at issue.
 {¶ 75} Furthermore, R.C. 2307.33(F) provides the following:
 {¶ 76} "When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or loss to person or property or the same wrongful death, the following apply: (1) the release or covenant does not discharge any of the other tortfeasors from liability from injury, loss, or wrongful death unless its terms so provide, but it reduces the claims against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is greater.
"(2) The release or covenant discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor."
 {¶ 77} So, even if we were to assume arguendo that Mrs. Dater did release the Foundation trustees in their capacities as such, the Foundation and the trustees were alleged to be joint tortfeasors, and, therefore, the Foundation would not have been released as a matter of law unless the settlement agreement specifically provided otherwise. Because the settlement agreement did not discharge the Foundation, but instead specifically provided that the Foundation was not released, any supposed release of the trustees would not have prevented Mrs. Dater from pursuing her claims against the Foundation.
 {¶ 78} Because Mrs. Dater did not release any parties in their capacities as trustees of the Foundation, and because Mrs. Dater's claims were based on the direct liability of the Foundation, we conclude that the Foundation was not entitled to summary judgment on the ground that they had been released from liability.
B. The Conversion Claim Remains Viable
 {¶ 79} In its second issue for review, the Foundation argues that Mrs. Dater relinquished her right to sue the Foundation for conversion of trust assets when she settled with its trustees. The Foundation contends that, because Mrs. Dater released the Foundation trustees from all claims relating to their allegedly wrongful conduct with respect to the Dater Trust assets, she was estopped from litigating a claim against the Foundation for "wrongful receipt" and retention of the Dater Trust assets. The Foundation argues alternatively, in its third issue for review, that even if Mrs. Dater was not estopped from litigating a claim against the Foundation for "wrongful receipt and retention of the Dater Trust assets," the Foundation was still entitled to summary judgment on her conversion claim because the claim was dependent upon the wrongful exercise of dominion or control over the corpus of the Dater trust, and Mrs. Dater's voluntary dismissal of her other claims against the Foundation trustees effectively extinguished her conversion claim. Because these issues are interrelated, we address them together.
 {¶ 80} To the extent that the Foundation argues that Mrs. Dater's conversion claim is no longer viable because the acts giving rise to the conversion were undertaken by the Foundation trustees, rather than the Foundation itself, the argument lacks merit for the reasons stated in our discussion of the first issue for review. Therefore, because the Foundation trustees were never released in their capacities as such, Mrs. Dater's conversion claim remains viable. Consequently, we conclude that the Foundation was not entitled to summary judgment on the conversion claim.
C. The Claims for Unjust Enrichment and Constructive Trust RemainViable
 {¶ 81} The Foundation further contends, in its fourth issue for review, that because Mrs. Dater failed to set forth a viable claim for conversion and because her claims for unjust enrichment and constructive trust merely sought equitable remedies, it was entitled to summary judgment on those claims as well. We conclude to the contrary upon our determinations that her conversion claim remains viable and her claims for unjust enrichment and constructive trust are independent of her conversion claim.[32]
 D. Res Judicata does not Apply
 {¶ 82} In the fifth issue for review, the Foundation contends that the doctrine of res judicata precluded Mrs. Dater from asserting claims against the Foundation based upon the alleged wrongdoing of the dismissed Foundation trustees. The Foundation argues that, because it was in privity with the trustees, and because Mrs. Dater had previously settled her claims against them, she was barred from asserting her claims against the Foundation.
 {¶ 83} Under the doctrine of res judicata, "[a] valid, final judgment rendered upon the merits bars all subsequent actions based upon any claims arising out of the transaction or occurrence that was the subject matter of the previous action."[33] Thus, in order for res judicata to apply, a party must demonstrate that a valid, final judgment has been rendered upon the merits, and that an identity of the parties or their privies exists.[34] Ohio courts have held that consent decrees are effectively litigation of the merits and may consequently operate as a valid, final judgment for purposes of res judicata.[35]
 {¶ 84} The Foundation relies upon a line of cases involving consent decrees, as well as the Tenth Appellate District's decision in Red HavenNursing Home, Inc. v. Cuddy,[36] to support its argument. In Cuddy, the Tenth Appellate District held that the doctrine of collateral estoppel applied to prevent the parties to a settlement agreement from relitigating the calculation of a disputed cost. Central to the court's analysis was its determination that the specific settlement agreement between the parties had adjudicated a disputed issue of fact.
 {¶ 85} In this case, however, the trial court's order of dismissal with respect to the trustees provided only the following: "Upon application and for good cause shown, all claims against all Defendants in this action, except for the Charles H. Dater Foundation, are hereby dismissed with prejudice." The Foundation has set forth no authority for its proposition that an order of dismissal is a final judgment rendered upon the merits. Nor do we agree with its assertion that the settlement agreement between Mrs. Dater and the trustees was in effect a "consent decree" that barred Mrs. Dater's claims against the Foundation. And unlike the settlement agreement that was before the court in Cuddy, there is nothing in the record to demonstrate that the dismissed parties in this case entered into a settlement agreement that adjudicated an issue of fact. Instead, the settlement agreement expressly provided that "the plaintiffs and defendants agree that they are entering into this Agreement solely for the purposes of ending the lawsuit and saving the Trust the expenses of litigation, and nothing in this Agreement or the act of entering into this Agreement and ending the lawsuit shall be construed as an admission of liability by any party. Defendants expressly deny any liability." Because the dismissal order and settlement agreement did not constitute a final judgment upon the merits, the Foundation was not entitled to summary judgment on the ground that res judicata barred Mrs. Dater's claims.
E. Mrs. Dater Had Standing to Bring Her Claims Against the Foundation
 {¶ 86} Under its sixth issue for review, the Foundation contends that even if Mrs. Dater's settlement with the trustees of the Dater Trust did not extinguish her claims against the Foundation, Mrs. Dater had no standing to maintain this action against the Foundation, because under Ohio law only a trustee of a trust is vested with the legal title to the trust property and has the power to sue to protect or preserve the trust. The Foundation contends, that because the amended complaint presented claims that were made and served in March 2001, R.C. 2107.46
required Mrs. Dater to serve a written demand upon PNC Bank, the successor trustee, prior to filing this action.[37]
 {¶ 87} R.C. 2107.46 provides:
 {¶ 88} "Any fiduciary may maintain an action in the probate court against creditors, legatees, distributees, or other parties, and ask the direction or judgment of the court in any matter respecting the trust, estate, or property to be administered, and the rights of the parties in interest.
 {¶ 89} "If any fiduciary fails for thirty days to bring such action after a written request from a party in interest, the party making the request may institute the suit."
 {¶ 90} R.C. 2109.01 provides that the definition of a "`[f]iduciary' as used in Chapters 2101 to 2131 of the Revised Code * * * means any person * * * appointed by and accountable to the probate court and acting in a fiduciary capacity for any person, or charged with duties in relation to any property, interest, trust, or estate for the benefit of another * * *."
 {¶ 91} Mrs. Dater and the Ohio Attorney General contend that R.C.2107.46 does not apply in this case because (1) the Dater Trust was an inter vivos trust, and (2) because the current trustee of the Dater Trust, PNC Bank, was not a "fiduciary" as defined by R.C. 2109.01. They alternatively argue that, even if R.C. 2107.46 is applicable, Mrs. Dater complied with the statute when she presented a written demand to the trustees of the Dater Trust in 1998, and those trustees failed for 30 days to bring an action. They further argue that there is no statutory requirement that a beneficiary who has already made a written demand upon a trustee make a subsequent written request upon a successor trustee before the beneficiary may bring an action on behalf of the trust. We agree.
 {¶ 92} Ohio courts that have expressly considered the definition of "fiduciary" as set forth in R.C. 2109.01 have determined that the definition does not include a trustee of an inter vivos trust. In CentralNatl. Bank of Cleveland v. Brewer,[38] the common pleas court held,
 {¶ 93} "Section 2109.01 makes it clear that fiduciary as used here means one appointed by and accountable to the probate court * * *. The section quoted, therefore, is not applicable to the trustee of an inter vivos trust."
 {¶ 94} Furthermore, it is well settled that a probate court has supervisory authority only over testamentary trusts and testamentary trustees.[39] Because the Dater Trust, which funded the Foundation, was a valid inter vivos trust, and because neither the original trustees of the Dater Trust nor the current trustees were appointed by the probate court or were accountable to the probate court, they could not be considered as "fiduciar[ies]" as that term is defined in R.C. 2109.01. Because the trustees of the Dater Trust have never been "fiduciar[ies]" as defined by R.C. 2109.01, the provisions of R.C. 2107.46 do not apply to the Dater Trust.
 {¶ 95} In its seventh and final issue for review, the Foundation contends that Mrs. Dater had no standing to pursue claims against the Foundation because (1) R.C. 109.24 provides that the Ohio Attorney General is the sole entity designated by law to investigate and oversee the enforcement of "charitable trusts," and (2) Mrs. Dater, as a private party, had "no special interest in the enforcement of the charitable trust."
 {¶ 96} While we agree that only the Ohio Attorney General and other narrowly defined groups have standing to bring an action to enforce or administer a charitable trust, Mrs. Dater's action did not purport to seek oversight over the Foundation's administration or to enforce the terms of a charitable trust. Rather, her action sought the return of certain assets from the Dater Foundation to the Dater Trust. Because Mrs. Dater's suit did not seek to enforce or administer a charitable trust, the Foundation's arguments and corresponding authorities are inapposite. We, therefore, conclude that the Foundation was not entitled to summary judgment on the ground that Mrs. Dater lacked standing.
 {¶ 97} Because the Foundation has not demonstrated that it was entitled to summary judgment as a matter of law, and because a genuine issue of material fact exists as to the mental capacity of Mr. Dater at the time he made the transfers to the Foundation, we conclude that the trial court did not err in denying the Foundation's motion for summary judgment. Consequently, we overrule the Foundation's sole assignment of error.
 IV. Conclusion {¶ 98} Therefore, the judgment of the common pleas court dismissing Mrs. Dater's claims against the Foundation and issuing a protective order to the Foundations is reversed, and this cause is remanded for further proceedings in accordance with the law and this Opinion.
Judgment reversed and case remanded.
Hildebrandt and PAINTER, JJ., concur.
[1] It appears from the record that there is no criteria in place for the replacement of trustees to the Foundation, and that the current trustees have an informal agreement in place whereby their positions are handed down from one family member to another.
[2] The trust also provided that each trustee was to receive a minimum trustee fee equal to what a bank trustee would receive; that attorney fees were to be paid to the attorneys "or the survivor of them" in an amount equal to the minimum trustee fee, without any requirement that the attorney or "survivor" have actually provided any legal services; and that if the brokers stopped acting as co-trustees, then each of them or the "successor or survivor" of them "shall be entitled to an Investment Advisor's and broker's fee no less than the minimum trustee's fee," without any requirement that the brokers have provided investment advice or broker's services.
[3] Dorothy Krone became a successor trustee in 1995 for both the Charles H. Dater Trust and the Dater Foundation after the death of her husband, Paul Krone.
[4] Pursuant to R.C. 109.25, the attorney general is a necessary party in proceedings concerning charitable trusts and represents the interests of trust beneficiaries.
[5] See Dater v. Charles H. Dater Foundation (December 1, 2000), 1st Dist. Nos. C-990864 and C-000002.
[6] (1976), 45 Ohio St.2d 178, 343 N.E.2d 121.
[7] The amended complaint was assigned to a new judge.
[8] We find the court's comment confusing given that there is no evidence in the record that Dater ever presented Dr. Alden's letter to the court prior to its order of March 5, 2002. Although the parties discussed the letter at the February 22, 2002, hearing, the trial court was not provided with a copy of the letter until the Foundation filed its motion for sanctions in July 2002 and attached the letter as an exhibit.
[9] While there was much discussion among Mrs. Dater's counsel, the Foundation's counsel, and the trial court about what was said at the telephone conference, the conversation was not transcribed.
[10] See Quonset Hut v. Ford Motor Company (1997), 80 Ohio St.3d 46,48, 684 N.E.2d 319, citing DeHart v. Aetna Life Ins. Co. (1982),69 Ohio St.2d 189, 192, 431 N.E.2d 644, and Jones v. Hartranft,78 Ohio St.3d 368, 372, 1997-Ohio-203, 678 N.E.2d 530.
[11] See id.
[12] See Toney v. Berkemer (1983), 6 Ohio St.3d 455, 453 N.E.2d 700.
[13] See id. at 458, 453 N.E.2d 700.
[14] (1991), 75 Ohio App.3d 160, 163, 598 N.E.2d 1287.
[15] (May 18, 2000), 8th Dist. No. 76536.
[16] See, also, Baker v. Edmonds (Mar. 7, 2003), 2nd Dist. No. 2002-CA-47 (holding that the trial court abused its discretion when it imposed the sanction of default judgment against a defendant who had failed to appear for his deposition, but had supplied a letter from his physician stating he was under the physician's care and needed to be closely monitored to correct a life-threatening abnormality, even though it was unclear whether the doctor's letter complied with the condition in the court's order requiring the defendant to produce a valid medical excuse for his failure to appear at the deposition); Card v. Tatum (May 14, 1998), 8th Dist. No. 73678 (holding that the trial court abused its discretion in granting default judgment where the defendant had produced a physician's letter stating that he was unable to travel from Florida to Cleveland); Belli v. Kennedy (Aug. 25, 1989), 6th Dist. No. L-88-158 (holding that the trial court did not abuse its discretion by refusing to grant a dismissal when the noncomplying party had provided a legitimate medical excuse for the failure to appear at a scheduled deposition).
[17] Evans v. Smith, supra, at 163, 598 N.E.2d 1287; see, also, Jones,
supra, at 371-372, 678 N.E.2d 530.
[18] See Ruwe v. Bd. of Springfield Twp. Trustees (1987),29 Ohio St.3d 59, 61, 505 N.E.2d 957.
[19] See Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219, 450 N.E.2d 1140.
[20] AAAA Enterprises, Inc. v. River Place Community UrbanRedevelopment Corp. (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597; Grantv. Ohio Dept. of Liquor Control (1993), 86 Ohio App.3d 76, 83,619 N.E.2d 1165.
[21] See Covington v. The MetroHealth System, 150 Ohio App.3d 558,2002-Ohio-6629, 782 N.E.2d 624, at ¶ 23.
[22] See Tschantz v. Ferguson (1994), 97 Ohio App.3d 693, 715,647 N.E.2d 507.
[23] Dennis v. State Farm Ins. Co., 143 Ohio App.3d 196, 204,2001-Ohio-3178, 757 N.E.2d 849.
[24] See Gray-Jones v. Jones (2000), 137 Ohio App.3d 93, 102-03,738 N.E.2d 64 (holding that plaintiff's conduct in filing a harassing lawsuit and her "later actions" of "leaving harassing and threatening phone messages" were relevant "to show her intent and motive");Iron CitySash Door Co. v. Mohl (May 5, 1988), 7th Dist. Nos. 86 C.A. 5 and 87 C.A. 46 (holding that the trial court did not err in allowing evidence of thefts and settlement of thefts as proof of defendant's scheme or mode of operation involved in his conversions).
[25] See, e.g., Scott Pontzer v. Liberty Mutual Fire Ins. Co.,85 Ohio St.3d 660, 1999-Ohio-292, 710 N.E.2d 1116, overruled on other grounds in Westfield Ins. Co. v. Galatis, 100 Ohio St.3d 216,2003-Ohio-5849, 797 N.E.2d 1256 (holding that "a corporation can only act by and through real live persons").
[26] Although the trial court sealed the settlement agreement, neither the Foundation nor Mrs. Dater has moved this court to seal this portion of the record in this case.
[27] See Civ.R. 56(C).
[28] Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105,671 N.E.2d 241.
[29] Brewer v. Cleveland City Schools Bd. of Edn. (1997),122 Ohio App.3d 378, 383, 701 N.E.2d 1023.
[30] (May 14, 1997), 1st Dist. Nos. C-960424, and C-960425.
[31] American Ins. Group v. McCowin (1966), 7 Ohio App.2d 62,218 N.E.2d 746; Czubaj v. E.B.P. (Oct. 12, 1995), 8th Dist. No. 65517.
[32] See Banks v. Nationwide Mut. Fire Ins. Co. (Nov. 28, 2000), 10th Dist. No. 99AP-1413 (providing that claims for unjust enrichment and constructive trust are equitable claims that are alternative to and independent of legal-based tort claims such as conversion); Liberty Mut.Ins. Co. v. Industrial Comm. of Ohio (1988), 40 Ohio St.3d 109, 110-111,532 N.E.2d 124 (holding that "an action in unjust enrichment will lie [any time] a party retains money or benefits which in justice and equity belong to another."); Ferguson v. Owens (1984), 9 Ohio St.3d 223, 225,459 N.E.2d 1293, (holding that "a court in equity decreeing a constructive trust is bound by no unyielding formula").
[33] Grava v. Parkman, 73 Ohio St.3d 379, 1995-Ohio-331, 653 N.E.2d 226, paragraph one of the syllabus.
[34] Ameigh v. Baycliffs Corp., 81 Ohio St.3d 247, 1998-Ohio-467,690 N.E.2d 872.
[35] See Sponseller v. Sponseller (1924), 110 Ohio St. 395, 144 N.E. 48;In re Gilbraith (1987), 32 Ohio St.3d 127, 129, 512 N.E.2d 956.
[36] (May 17, 1984), 10th Dist. No. 83AP-773.
[37] The Foundation relies upon Firestone v. Galbreath (S.D.Ohio 1990), 747 F. Supp. 1556, 1564-1565, and Firestone v. Galbreath (Oct. 6, 1992), 10th Dist. Nos. 92AP-150, 92AP-154, 92AP-159, as support for its argument that the demand provisions of R.C. 2107.46 apply to an inter vivos trust. But because neither court considered or construed the definitional limitation of a "fiduciary" as set forth in R.C. 2109.01, we do not find their analysis persuasive.
[38] (1966), 8 Ohio Misc. 409, 412, 220 N.E.2d 846.
[39] See R.C. 2101.24(E); Dollar Sav. Trust Co. v. First Natl.Bank of Boston (1972), 32 Ohio Misc. 81, 92-93, 285 N.E.2d 768, citing R.C. 2101.24, and 2109.01, and Purcell v. The Cleveland Trust Co.
(1965), 6 Ohio App.2d 235, 217 N.E.2d 876.